UNITED STATES of America, Appellee,

v.

Wilfredo DIAZ–VILLAFANE, Defendant, Appellant.

No. 88–1998.

United States Court of Appeals, First Circuit.

Heard Feb. 28, 1989.

Decided May 4, 1989.

Rehearing and Rehearing En Banc Denied June 6, 1989.

Rafael F. Castro Lang, San Juan, P.R., by Appointment of the Court, for defendant, appellant.

Jorge L. Arroyo, Asst. U.S. Atty., Old San Juan, P.R., with whom Daniel F. Lopez–Romo, U.S. Atty., Hato Rey, P.R., was on brief for the U.S.

Before BREYER, TORRUELLA and SELYA, Circuit Judges.

SELYA, Circuit Judge.

This appeal necessitates that we consider the effect of the district court's failure to adhere to a local rule. It also requires, for what seems to be the first time, that we review a sentence in order to determine whether the district court correctly calculated, and thereafter appropriately depart-

ed from, the newly-minted sentencing guidelines (Guidelines) promulgated by the United States Sentencing Commission pursuant to the Commission's statutory mandate. *See* Sentencing Reform Act, as amended, 18 U.S.C. § 3551 *et seq.* (1982 & Supp.1988); 28 U.S.C. §§ 991–998 (Supp. 1988) (collectively, the Act). Finding no reversible error, we affirm.

## I. BACKGROUND

Defendant-appellant Wilfredo Diaz–Villafane pled guilty to a single count (of a multicount indictment) charging possession with intent to distribute 20 grams (net weight) of heroin in violation of 21 U.S.C. § 841(a)(1) (1982) (maximum allowable sentence: 20 years). Following standard convention, *see* Fed.R.Crim.P. 32(c), the judge ordered that a presentence investigation report (PSI) be prepared. When completed, the PSI concluded that Diaz–Villafane's total offense level and criminal history category placed him in a sentencing range of 27–33 months under the Guidelines.

Appellant objected to the PSI on several grounds. The district court held a hearing on September 1, 1988. Two government witnesses testified. The court made certain sentencing findings (later committed to writing), and, grounding its upward departure from the Guidelines on these findings, sentenced defendant to a 10–year prison term.

On appeal, Diaz–Villafane argues that (1) the sentencing hearing was contaminated by failure to comply with a court rule; (2) the district judge calculated the offense level inaccurately; and (3) the judge's substantial departure from the sentencing range indicated by the Guidelines was altogether impermissible.

## II. NONCOMPLIANCE WITH LOCAL RULES

When appellant was sentenced, the Local Rules of the District of Puerto Rico seemingly provided that:

> If either party wishes to call any witnesses at the imposition of sentence hearing, counsel shall submit, in writing to the Court, the Probation Officer, and oppos-

ing counsel, *not later than five (5) days before the imposition of sentence,* a statement containing (a) the names of the witness[es], (b) a synopsis of their anticipated testimony, and (c) an estimate of the anticipated length of the hearing.

D.P.R.L.R. 418.6 (emphasis supplied). It is uncontested that the prosecutor did not give the 5–day written notice contemplated by the rule. Notwithstanding, when the government sought to call witnesses at the sentencing hearing and the defense objected, the court refused to invoke the rule, declaring that it was "suspended" and "not in effect." Although we find the local rule to have been in force, we think that the court had power to suspend it in this instance.

■ Local Rule 418.6 was adopted on May 20, 1988. According to the June 2, 1988 minutes of the Committee for the Revision of the Local Rules for the United States District Court for the District of Puerto Rico, Rule 418 "as already approved, [remained] in effect until further order." Once so adopted:

> A local rule … shall remain in effect unless amended by the district court or abrogated by the judicial council of the circuit in which the district is located.

Fed.R.Crim.P. 57. On September 1, neither of these conditions had been fulfilled: the district court had not perfected an amendment and the circuit council had not intervened. The government acknowledges that the operation of Rule 418.6 had not been stayed. Although the district court was actively considering amendments to Rule 418 (on June 28, the court had issued a public notice suggesting that the rule needed modification and requesting comments on certain proposed amendments), none had been enacted. Without more, publication of a notice of *contemplated* revision does not constitute withdrawal or suspension of a local rule.

Our conclusion that Local Rule 418.6 was in force does not end our inquiry. Local Rule 105 authorized the district court to suspend local rule requirements in a given

case.[1] The savings clause contained in D.P.R.L.R. 105 mirrors the widely-accepted idea that a district court should be accorded considerable latitude in applying local procedural rules of its own making, and in departing from them. *See Trundle v. Bowen*, 830 F.2d 807, 809 (8th Cir.1987); *Atlas Truck Leasing, Inc. v. First NH Banks, Inc.*, 808 F.2d 902, 903 (1st Cir. 1987); *United States v. Warren*, 601 F.2d 471, 474 (9th Cir.1979); *United States v. Cicilline*, 571 F.Supp. 359, 364 (D.R.I. 1983). In general, "[i]t is for the district court to determine what departures from its rules may be overlooked." *Braxton v. Bi-State Dev. Agency*, 728 F.2d 1105, 1107 (8th Cir.1984).

 Let us be perfectly clear. We do not suggest that such discretion is unbridled. Once local rules have been promulgated, lawyers and their clients have a right to place reasonable reliance on them. *See United States v. Ferretti*, 635 F.2d 1089, 1093 (3d Cir.1980). To set the strictures of a local rule to one side without advance notice, the court (1) must have a sound reason for doing so, and (2) must ensure that no party's substantial rights are unfairly jeopardized. These preconditions, we believe, were met in this case.

The record indicates that the trial judge had two excellent reasons for sidestepping literal compliance with D.P.R.L.R. 418.6:

1. The judges of the district court and the committee on rule revisions had come to doubt the workability of the Rule, and there was a legitimate question as to whether it remained in effect. (Indeed, the judge had been the principal draftsman of a proposed amendment; and the amendment was, at the time, circulating among the judges of the district court for signature.)

2. In this case, sentencing had been set for September 1. Defense counsel received notice no later than August 22 that the PSI was complete. Yet, he did not serve his objections to it until August 29. Thus, the prosecutor could not possibly have given the 5-day notice contemplated by Rule 418.6.

These reasons, we think, were sufficient to justify suspension of the local rule in the absence of cognizable prejudice. To be sure, appellant claims prejudice: had counsel been armed with the witnesses' names and a synopsis of anticipated testimony, cross-examination would have been enhanced and rebuttal evidence assembled. But, appellant is brandishing a cardboard sword. His claim consists mainly of gauzy generalities. He has been unable credibly to suggest how cross-examination might more fruitfully have been conducted or what material evidence, not available at the time, he would have submitted.

On the other pan of the scale, there was scant potential for surprise: all of the matters traversed by the testimony were within the framework of, and covered by, the PSI—which had been available to defendant for upward of a week before the hearing. Moreover, it was Diaz-Villafane, by and large, who set the agenda for the evidence. In objecting to the PSI, he contested certain facts. He knew that the purpose of the sentencing hearing was to resolve those contests. *See* Fed.R.Crim.P. 32(c)(3)(D). Having put the prosecution to its proof of the disputed items, any claim of surprise on his part is as empty as a beggar's purse.[2]

---

1. The rule provides:

 The Court may suspend or modify the requirements or provisions of any of these rules in a particular case by written order. When a judge of this court issues any order in a specific case which is not consistent with these rules, such order shall constitute a suspension of these rules for such case and only to the extent that it is inconsistent therewith.

 D.P.R.L.R. 105. We recognize that the first sentence speaks of suspension "by written order," but the second sentence appears to us amply to cover a situation where the judge, "not consistent with" the first sentence of Rule 105 itself, suspends a local rule *ore tenus*.

2. Admittedly, the hearing also produced some corroboration of *uncontested* facts mentioned in the PSI. But any error in receiving that testimony was necessarily harmless. Because appellant had not objected to the inclusion of those facts in the PSI, the district court was entitled to accept them as true for purposes of sentencing even without additional evidence being introduced.

And there is more. We find it of decretory significance that defense counsel, although seeking unsuccessfully to block the testimony entirely, never moved for a continuance to prepare for cross-examination or to muster additional evidence. Appellant's present claim that he was unfairly surprised is severely undermined, if not entirely undone, by his neglect to ask the district court for a continuance to meet the claimed exigency. *See, e.g., United States v. Ingraldi,* 793 F.2d 408, 413 (1st Cir.1986) (defendant's failure to move for continuance despite delayed disclosure of files indicates lack of prejudice). If, indeed, this was a sneak attack, then a continuance would have been a complete cure. It is, we think, incumbent upon a party faced with such a situation to ask explicitly that the court grant the time needed to regroup, or waive the point. *See Szeliga v. General Motors Corp.,* 728 F.2d 566, 568 (1st Cir. 1984) ("remedy for coping with surprise is not to seek reversal after an unfavorable verdict, but a request for continuance at the time the surprise occurs"); *United States v. Long,* 674 F.2d 848, 855 (11th Cir.1982) (similar). Appellant apparently did not need more time; the transcript shows that the witnesses were cross-questioned vigorously, thoroughly, and with an understanding born of familiarity.

Appellant makes one final (related) argument: that the failure to provide advance notice violated due process. The contention is meritless. A defendant has a right to fair sentencing procedures, *see United States v. Stevens,* 851 F.2d 140, 143 (6th Cir.1988), but he has no due process right to be informed in advance of the identity of witnesses or of the expected substance of their testimony. At most, a "[d]efendant ... has a constitutional right not to be sentenced on the basis of invalid information and, therefore, must be given an opportunity to rebut any challenged information." *United States v. Fogel,* 829 F.2d 77, 90 (D.C.Cir.1987) (citations omitted); *see also Stevens,* 851 F.2d at 143; *United States v. Safirstein,* 827 F.2d 1380, 1385 (9th Cir.1987); *Kohley v. United States,* 784 F.2d 332, 334 (8th Cir.1986). There was no shortfall here.

We need not reinvent the wheel. From what we have already written, it is evident that appellant was given the requisite opportunity to (1) challenge the information contained in the PSI,[3] (2) attempt to rebut the prosecution's version of the facts, and (3) cross-examine the government's witnesses. Notwithstanding this opportunity, appellant failed to establish that the information included in the PSI, presented at the hearing, or relied upon by the sentencing judge, was false. Diaz–Villafane received all of the process that was due.

We need strum these strings no more. In complaining of the nonobservance of the local rule, defendant, like the Pharisees of old, seems fixated on the symbols of piety to the exclusion of adequate concern with the spirit. The court below conducted itself fairly and did no violence to defendant's substantial rights. We conclude, therefore, that the court did not abuse its discretion in suspending D.P.R.L.R. 418.6 in the circumstances of this case. *Cf. Fogel,* 829 F.2d at 91 (defendant could not complain of government's failure timely to file sentencing memorandum where much of it consisted of transcripts to which defendant had access and defendant did not request additional time for review); *United States v. Mitchell,* 723 F.2d 1040, 1049 (1st Cir.1983) (violation of local rule constituted harmless error where defendant failed to show substantial prejudice).

## III. APPLYING THE GUIDELINES

Application of the Guidelines is essentially a seven step process: the court (1) ascertains the statute of conviction; then (2) determines the "base offense level" corresponding thereto; then (3) computes a "to-

---

**3.** The record reflects that, when appellant received and reviewed the initial draft of the PSI, he suggested several changes which the probation officer accepted. The PSI was amended in these respects before it was presented to the district judge. The objections heard on September 1 dealt with points on which the protagonists had agreed to disagree. This circumstance, we think, goes a long way toward belying the claim that appellant's due process rights were mangled.

tal offense level" by adjustment of the base offense level to take into account defined desiderata such as the presence of multiple counts, victim characteristics, role in the offense, obstruction of justice, and acceptance of responsibility; then (4) ascertains defendant's "criminal history category;" then (5) uses a grid to determine the "sentencing range" indicated by the confluence of defendant's total offense level and criminal history category; then (6) considers possible departures; then (7) pronounces sentence. *See United States Sentencing Commission Guidelines Manual* (*Manual*) § 1B1.1 at 1.13 (rev. ed. 1988); *see also United States v. Wright*, 873 F.2d 437, 440 (1st Cir.1989).

Here, the count in question had a base offense level of 18. *See Manual* § 2D1.1(a)(3) & Drug Quantity Table at 2.37–2.39. The district court made two (offsetting) adjustments: it increased the offense level by two points because of appellant's role in the offense as "an organizer, leader, manager or supervisor" of criminal activity, *id.* § 3B1.1(c) at 3.3, and then subtracted two points for acceptance of responsibility. *See id.* § 3E1.1 at 3.21. Diaz–Villafane's total offense level, therefore, remained at 18. His criminal history category was I (the lowest possible) because, despite numerous pending drug charges, he had not previously been sentenced for any other offense. *See id.* § 4A1.1 at 4.1. The grid yielded a sentencing range of 27–33 months, but the district court, carefully articulating its reasons, imposed a 10–year sentence.

■ Diaz–Villafane challenges the district court's application of the Guidelines in but a single respect, objecting strenuously to the finding that he was "an organizer, leader, manager or supervisor" in a criminal activity involving more than one but fewer than five participants. *See Manual*

§ 3B1.1(c) at 3.3. Because this finding involves a "mixed" fact-law question, defendant has the burden of showing it to be "clearly erroneous." 18 U.S.C. § 3742(d); *see Wright*, at 443–44; *United States v. Mejia–Orosco*, 867 F.2d 216, 220–21 (5th Cir.1989). We look to the record.[4]

The judge had before him evidence that defendant boasted of "controll[ing] the area" and that he was "protected with a bunch of individuals riding bikes, motorcycles and cars." During a drug sale on January 22, defendant was accompanied by a minor named Manolo; it was Manolo who actually delivered the heroin to the undercover agent. On the occasion of another transaction, youths on bicycles encircled Diaz–Villafane, warning him when he roamed too far afield. Another knowledgeable witness described appellant as "a leader," and gave considerable detail. Based on this evidence and more, the judge made a specific finding that appellant was "a person who had others working for him, up to five, and in that sense he was a leader or manager." The judge explained that, as he saw matters, Diaz–Villafane "was not working alone in these things...."

There need be no particular formality in the ossature of a narcotics enterprise to justify invocation of section 3B1.1. Drug dealers are unlikely to make much use of position descriptions or organizational charts. Particularly with respect to the relatively small criminal cabals contemplated by section 3B1.1(c)—2 to 5 people— "the distinction between organization and leadership, and that of management or supervision, is of less significance than in larger enterprises that tend to have clearly delineated divisions of responsibility." *Manual* § 3B1.1, Background at 3.4. Even were we to grant the benefit of any doubt and assume that the evidence could have been interpreted to cast Diaz–Villafane as a day laborer rather than a straw boss, it

---

4. The Act provides that an appellate court must set aside a sentence "*imposed* as a result of an incorrect application of the sentencing guidelines." 18 U.S.C. § 3742(e)(1) (emphasis supplied). In this case, the district court, although ascertaining the sentencing range decreed by the Guidelines, elected to sentence outside that range. It is, therefore, arguable that any computational error in assigning a total offense level was harmless. Because the government has not raised the point, however, we assume for purposes of this case that the challenged finding affected defendant's sentence.

would avail him nothing. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). The district court's characterization of appellant's role was altogether supportable.

## IV. DEPARTURE FROM THE GUIDELINES

Under the Sentencing Reform Act, a district court may depart from the Guidelines if it "finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b); *see generally United States v. Russell*, 870 F.2d 18 (1st Cir.1989) (per curiam). The Commission's intentions are clear:

> The Commission intends the sentencing courts to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted.... [T]he Commission does not intend to limit the kinds of factors (whether or not mentioned anywhere else in the guidelines) that could constitute grounds for departure in an unusual case.

*Manual* § 1A4(b) at 1.6–1.7.[5] With this signpost pointing the way, we turn to the departure below.

### A. *Standards of Review.*

■ We have yet to limn the standards of review applicable to departures from the Guidelines. We do so today. The process, as we see it, comprises three steps.

First, we assay the circumstances relied on by the district court in determining that the case is sufficiently "unusual" to warrant departure. That review is essentially plenary: whether or not circumstances are of a kind or degree that they may appropriately be relied upon to justify departure is, we think, a question of law.

Second, we determine whether the circumstances, if conceptually proper, actually exist in the particular case. That assessment involves factfinding and the trier's determinations may be set aside only for clear error. *See* 18 U.S.C. § 3742(d).

Third, once we have assured ourselves that the sentencing court considered circumstances appropriate to the departure equation and that those factors enjoyed adequate record support, the direction and degree of departure must, on appeal, be measured by a standard of reasonableness. 18 U.S.C. § 3742(e)(2); *see also Mejia–Orosco*, at 218 (distinguishing between standard of review for sentences within and without Guidelines); *United States v. Sturgis*, 869 F.2d 54, 56–57 (2d Cir.1989) ("scope of review on appeal ... is limited to deciding whether a sentence imposed outside the guideline range is 'unreasonable' "); *United States v. Ryan*, 866 F.2d 604, 609–10 (3d Cir.1989) (similar). In this context, reasonableness is determined with due regard for "the factors to be considered in imposing a sentence," generally,[6] and "the reasons for the imposition of the particular sentence, as stated by the district court...." 18 U.S.C. § 3742(d)(3).

This third step involves what is quintessentially a judgment call. District courts are in the front lines, sentencing flesh-and-blood defendants. The dynamics of the situation may be difficult to gauge from the antiseptic nature of a sterile paper record. Therefore, appellate review must

---

**5.** The Guidelines do proscribe departures based on enumerated factors such as race, sex, and national origin. *See Manual* § 5H1.10 at 5.31. No such forbidden factors are implicated in the sentencing decision under review in this case.

**6.** 18 U.S.C. § 3553(a) sets forth the factors to be considered in imposing sentence. They include the seriousness of the offense, deterrence, public protection, the indicated sentencing range under the Guidelines, policy statements of the Sentencing Commission, and avoidance of unwarranted disparities in sentencing. *Id.*

occur with full awareness of, and respect for, the trier's superior "feel" for the case. We will not lightly disturb decisions to depart, or not, or related decisions implicating degrees of departure.

In terms of Diaz–Villafane's sentence, we believe that the departure inquiry can be compressed. Accordingly, we examine the sufficiency of the grounds for departure, legally and factually (steps one and two); and, finding the grounds to be solid, we then examine the reasonableness of the upward departure (step three).

### B. *The Grounds for Departure.*

■ Pursuant to 18 U.S.C. § 3553(c)(2), the district court stated in some detail its reasons for abandoning the Guidelines: (1) defendant's status as an "important supplier ... to drug addicts in the Ponce, Puerto Rico area;" (2) the pendency of eight trafficking charges against defendant in the Commonwealth courts; (3) defendant's use of "adolescent or pre-adolescent children" to deliver narcotics; (4) defendant's involvement in drug ventures that reaped $10,000–$15,000 daily, "as reported by himself;" and (5) the purity of the heroin. We believe that these circumstances were appropriately considered and that the court's findings were satisfactorily record-rooted. We explain briefly.

1. *Important Supplier.* Defendant apparently concedes that this factor was relevant. In turn, the record leaves no question but that the court's characterization of Diaz–Villafane in this light was justified.

2. *Pending Drug Charges.* That appellant was awaiting trial in the Commonwealth courts on eight other drug-related charges is undisputed. And, because he had not yet been convicted and sentenced on any of them, those charges were not taken into account in calculating his criminal history category. *See Manual* § 4A1.1 at 4.1; § 4A1.2 at 4.5. They could nevertheless be considered in the departure calculus. Departure was permissible where:

> ... reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the

likelihood that the defendant will commit other crimes. Such information may include, but is not limited to, information concerning: ...

\* \* \* \* \* \*

> (d) whether the defendant was pending trial, sentencing, or appeal on another charge at the time of the instant offense;
> (e) prior similar adult criminal conduct not resulting in criminal conviction.

*Id.* § 4A1.3 at 4.8–4.9. Both subsections (d) and (e) apply to this case. At least some of the Commonwealth charges were pending, and probable cause had been established, when Diaz–Villafane committed the offense for which he was indicted federally. Without exception, the Commonwealth charges appear to be for "prior similar adult criminal conduct," *i.e.*, possession and/or distribution of heroin. Thus, the district court had "reliable information" constituting grounds for departure under section 4A1.3. *Cf. Sturgis*, at 57 (upholding district court's departure from Guidelines to take account of prior state felony convictions for which sentences were pending).

3. *Use of Minors.* Even a cursory examination of the record shows the district court's conclusion that Diaz–Villafane "at least once" used children to deliver drugs to be unimpugnable. There was testimony by two witnesses that an 11–year–old was carrying, and actually handed over, contraband on at least one occasion, in appellant's presence; and that appellant pocketed the purchase price. The fact that the minor was never identified (other than by the sobriquet "Manolo"), nor asked to testify at the sentencing hearing, went to the weight of the evidence, not its adequacy.

4. *Amount of Money Involved.* The objection to the court's finding that appellant was involved "in a venture that profited, as reported by himself, from $10–15,000 per day," is unavailing. Defendant's main point seems to be that this conclusion was implicitly contradicted by (1) the PSI (which did not indicate that Diaz–Villafane enjoyed an opulent lifestyle), and (2) the absence of any fine (a fine must be imposed in a

drug-trafficking case unless the court determines that defendant is unable to pay, *Manual* § 5E4.2(a) at 5.18). But, the district court's finding was not that Diaz–Villafane had *personally* profited to such a munificent extent; it was that the "venture" in which he willingly participated was of that order of financial magnitude. This description was amply bulwarked. Two witnesses testified that defendant bragged about selling up to $15,000 worth of heroin daily. Although defendant denied the truth of the rodomontade, the court was free to disbelieve him. *See United States v. Cintolo*, 818 F.2d 980, 989 (1st Cir.) (trier not bound to accept self-serving stories of persons accused), *cert. denied,* —— U.S. ——, 108 S.Ct. 259, 98 L.Ed.2d 216 (1987); *cf. Wright*, 873 F.2d at 442–444 (no clear error where district court debunked appellant's statement anent comparative role in criminal scheme). And because the challenged finding dealt with the venture, not with defendant personally, neither the fact that his financial statement reflected earnings far below $10,000–$15,000 per day, nor the district court's decision to abjure imposition of a fine, necessarily undermined it.

5. *Purity of the Heroin.* Appellant concedes the accuracy of the finding that the drug sample was 33% pure, but argues that purity was already taken into account in arriving at the base offense level. He is wrong. The drug quantity table contained in the Guidelines (from which the base offense level was initially determined), refers to "the entire amount of the mixture or compound," if it contains "any detectable amount of a controlled substance." *Manual* § 2D1.1, Drug Quantity Table at 2.39.[7] In contrast, the purity level to which the judge alluded referred to the controlled substance as a percentage of the mixture.

The Commentaries to section 2D1.1 flatly state:

> Trafficking in controlled substances, compounds, or mixtures of unusually high purity, may warrant an upward departure. The purity of the controlled substance, particularly in the case of heroin, may be relevant in the sentencing process because it is probative of the defendant's role or position in the chain of distribution. Since controlled substances are often diluted and combined with other substances as they pass down the chain of distribution, the fact that a defendant is in possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs.

*Manual* § 2D1.1, Application Notes at 2.40. The district court had every right to ground a departure on the heroin's high degree of purity. *Accord Ryan*, at 607–09.

C. *Reasonableness of the Departure.*

█ Having ascertained that sufficient grounds existed, legally and factually, to justify a departure, we inspect the extent of the departure to assess whether the district court—which more than tripled defendant's maximum indicated sentence—acted reasonably. We think that it did.

At the threshold, we must deal with appellant's contention that departures are merely a matter of arithmetic. A facet of the objection with regard to use of minors is illustrative. Appellant refers to section 2D1.2 of the Guidelines, arguing that, had he been charged with distributing to minors under 21 U.S.C. § 845(b) (which he was not), and a youngster under the age of 14 was involved, his sentence could not exceed 51 months. *See Manual*, § 2D1.2 at 2.46.[8] Therefore, we are told, a sen-

---

7. Presumably, that is because purity and amount often go hand in hand in drug cases; unusual purity tends to indicate a person fairly high up in the chain of distribution, as does large quantity.

8. Appellant makes much the same sort of argument with respect to the eight pending drug charges. He says that, taking all of these charges together, the total quantity of narcotics involved would, under the Guidelines, result in

a base offense level of only 18 (drug quantity of between 20 and 39 grams of heroin), and a maximum indicated sentence of 33 months for one with his prior record. Any increment above that level, Diaz–Villafane contends, would be unreasonable. Among its other deficiencies, this argument, of course, ignores that "[r]epeated criminal behavior is an indicator of a limited likelihood of successful rehabilitation." *Manual* § 4A1.1, Introductory Commentary at 4.1.

tence of 120 months is clearly unreasonable. We decline the invitation to enter so surreal a world.

There are several flaws in appellant's reasoning. First, if Diaz–Villafane had been charged under section 845(b), the district court could still have departed from the Guidelines for the host of other reasons present in this case. Second, the Sentencing Commission has explicitly stated that the mention of a circumstance elsewhere in the Guidelines does not restrict the sentencing court from taking that circumstance into account in departure decisions. *See Manual* § 5K2.0 at 5.36. If appellant's logic were to prevail, the judge would be bound to search for the presence of each discerned circumstance elsewhere in the Guidelines, attribute a sentencing range to it, and then add the various sentences together before arriving at a final sentence. The Sentencing Commission, in describing its "basic approach," cautioned against such an additive approach:

> The list of potentially relevant features of criminal behavior is long; the fact that they can occur in multiple combinations means that the list of possible permutations of factors is virtually endless. The appropriate relationships among these different factors are exceedingly difficult to establish, for they are often context specific .... the relationship between punishment and multiple harms is not simply additive. The relation varies, depending on how much other harm has occurred. (Thus, one cannot easily assign points for each kind of harm and simply add them up, irrespective of context and total amounts.)

*Manual* § 1A3 at 1.3. For our part, we reject defendant's attempt to turn idiosyncratic departure decisions into mechanistic bean-counting.

That said, we conclude that the district court's retreat from the Guidelines in sentencing Diaz–Villafane was reasonable. The circumstances upon which the court based the departure were "not adequately taken into consideration by the Sentencing Commission in formulating the guidelines," 18 U.S.C. § 3553(b), and swept the case well out of the mainstream. They were, therefore, permissible grounds for departure. As to the degree of departure, it was admittedly substantial. Yet, having in mind the district court's firsthand knowledge of the case and its careful exposition of the reasons why it thought the situation to be markedly atypical, we cannot say that the sentence imposed was outside of the universe of acceptable punishments. Put another way, the departure seems reasonable.

Although "there appears to be some inherent tension in the guidelines themselves as to the extent to which departure is permissible," *Ryan*, at 609, we read the Guidelines as envisioning considerable discretion in departure decisions, at least at this early stage of their existence. *See* S.Rep. No. 225, 98th Cong., 2d Sess., *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3235 (purpose of Guidelines "is to provide a structure for evaluating the fairness and appropriateness of the sentence for an individual offender, not to eliminate the thoughtful imposition of individualized sentences"); *see also Mejia–Orosco*, at 218; *Sturgis*, at 56–57; *Ryan*, at 610; *United States v. Correa–Vargas*, 860 F.2d 35, 37 (2d Cir.1988). Although we are cognizant that departures should be the exception rather than the rule, *see, e.g., United States v. Uca*, 867 F.2d 783, 787 (3d Cir. 1989) ("attempts to impose uniformity will be destroyed if courts depart often from the Guidelines"), we must nonetheless defer, within broad limits, to the trial judge's intimate familiarity with the nuances of a given case. As the Sentencing Commission itself has stated: "The controlling decision as to whether and to what extent departure is warranted can only be made by the court at the time of sentencing." *Manual* § 5K2.0, Grounds for Departure at 5.36. In this instance, the extent of the district court's departure from the Guidelines, though considerable, was within the realm of reason.

*Affirmed.*