**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Floyd Douglas BARNES,**
**Defendant–Appellant.**

No. 89–6179.

United States Court of Appeals,
Sixth Circuit.

Submitted May 4, 1990.

Decided Aug. 13, 1990.

W. Hickman Ewing, Jr., U.S. Atty., John Fowlkes, Asst. U.S. Atty., Memphis, Tenn., for plaintiff-appellee.

Bill Anderson, Jr., Memphis, Tenn., for defendant-appellant.

Before GUY and RYAN, Circuit Judges; and ENGEL, Senior Circuit Judge.

RALPH B. GUY, Jr., Circuit Judge.

Defendant, Floyd Barnes, entered a guilty plea to a violation of 18 U.S.C. § 922(g), felon in possession of a firearm.

Prior to the plea, Barnes brought a motion to suppress evidence, which was denied. The plea bargain preserved his right to appeal the denial of the motion to suppress. At the sentencing hearing following the plea, the district judge made an upward departure and sentenced the defendant to 27 months imprisonment, which was above the guideline maximum. Barnes now appeals both the denial of his motion to suppress and the upward sentencing departure.

Upon a review of the record, we conclude that the motion to suppress was properly denied and that the upward sentencing departure was appropriate under the circumstances.

## I.

A shooting incident between rival motorcycle gangs, the Iron Horsemen and the Outlaws Motorcycle Club, outside of Cincinnati, Ohio, resulted in several deaths. Several of the Iron Horsemen involved were from the Memphis, Tennessee, area and police authorities had reason to believe the violence that occurred would spill over into the Memphis area. A task force made up of representatives from different police agencies was assembled in an effort to head off a recurrence of the Cincinnati incident. Bart McEntire, a special agent with the Bureau of Alcohol, Tobacco, and Firearms, headed up the task force and presided at a briefing session.

Officers Cupp and Jefferson, members of the Memphis Police Department, were assigned to the task force and present at the briefing session. Cupp and Jefferson learned that Agent McEntire had information from reliable informants that Floyd Barnes, a convicted felon, was in the Memphis area, and that he was an "enforcer" for the motorcycle club. The informants had indicated that Barnes was armed at all times. Mug shots of Barnes were distributed. The game plan that emerged from the briefing session was that surveillance would be conducted of certain known individuals and certain locations that were hangouts for the motorcycle club members. Officers Cupp and Jefferson were assigned to surveil a clubhouse on Hale Street in Memphis.

Shortly after taking up their surveillance positions, the officers observed a man and woman leave the clubhouse and drive away in a black Lincoln auto. The officers followed the Lincoln, which pulled into a gasoline station; the male emerged from the driver's side and began pumping gas. Cupp and Jefferson pulled in behind the gas station in a location that allowed them to maintain visual contact with the Lincoln. When the driver alighted, the officers were able to identify him as Floyd Barnes from the mug shots in their possession.

When the Lincoln left the service station, it allegedly entered a busy street without yielding to oncoming traffic. The officers followed and pulled over the Lincoln. Both officers exited the police vehicle and Barnes got out of the Lincoln and started walking back toward the police car. No guns were drawn nor was any other show of force made. Officer Cupp asked Barnes to produce identification, which he proceeded to do. Officer Jefferson approached the passenger side of the Lincoln where the woman was seated and asked her to get out of the car. As she exited the vehicle, Officer Jefferson observed the barrel of a gun protruding from beneath a leather vest that was lying between the passenger's and driver's seat. Jefferson informed Cupp of this discovery, which turned out to be a loaded .44 magnum pistol. Cupp initiated a search of Barnes, which turned up three pocket knives, a small glass vial containing a white powdery substance, and $740 in cash. Barnes then was placed under arrest.

## II.

■ At the suppression hearing, it was not totally clear from Officer Cupp's and Jefferson's testimony whether they were attempting to justify the stop of Barnes on the basis of a traffic violation (entering the street without yielding to oncoming traffic) or on the basis of the information obtained at the briefing session. It is fair to say they were astride both horses. However, in questioning by defense counsel and the

trial judge, Officer Cupp, the more experienced of the two, readily indicated that it was his intent to stop Barnes with or without the traffic violation. The trial judge accordingly based his analysis and decision on whether the officers had justification for the stop absent the alleged traffic violation.[1] The trial judge concluded that they did and we agree. Judge Turner stated:

> This court finds that the Memphis Police Officers, Cupp and Jefferson, had articulable, reasonable suspicions to make a *Terry* stop of the defendant based on the information supplied to Agent McEntire by several reliable informants that the defendant, a convicted felon, was continuously armed.

In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court placed its imprimatur on brief investigatory stops made by police officers on the basis of reasonable suspicion not amounting to probable cause for arrest. In *Terry*, the reasonable suspicion was as to a crime about to be committed and arose from conduct observed by the officer who made the stop. However, in subsequent cases, the Court clarified that *Terry* stops were also permissible where the stops related to a crime already completed and where the information supplying the reasonable suspicion came from another person rather than the officer's personal observation. In *Adams v. Williams*, 407 U.S. 143, 147, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612 (1972), the Court held:

> In reaching this conclusion, we reject respondent's argument that reasonable cause for a stop and frisk can only be based on the officer's personal observation, rather than on information supplied by another person.

Later, the Court announced in *United States v. Hensley*, 469 U.S. 221, 229, 105 S.Ct. 675, 680, 83 L.Ed.2d 604 (1985):

> [I]f police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection

with a completed felony, then a *Terry* stop may be made to investigate that suspicion.

In our case, we have both a completed and an ongoing crime involved, since the offense of felon in possession is complete once the felon actually obtains possession of a firearm, but continues as long as it remains in his possession.

The principal issue in this case is whether the briefing by Agent McEntire was sufficient to provide the reasonable suspicion for the stop made by the Memphis officers. In analyzing this issue, we again find *Hensley* helpful. In *Hensley*, an arrest was made by officers relying on a "wanted flyer" issued by another police agency. In approving the denial of a motion to suppress evidence seized in the arrest, the Court stated:

> [W]hen evidence is uncovered during a search incident to an arrest in reliance merely on a flyer or bulletin, its admissibility turns on whether the officers who *issued* the flyer possessed probable cause to make the arrest. It does not turn on whether those relying on the flyer were themselves aware of the specific facts which led their colleagues to seek their assistance.

*Hensley*, 469 U.S. at 231, 105 S.Ct. at 681. The Court then went on to quote with approval from *United States v. Robinson*, 536 F.2d 1298, 1299 (9th Cir.1976):

> "[E]ffective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information."

Applying the *Hensley* rationale to this case, the question that must be answered is whether Agent McEntire would have had sufficient reasonable suspicion to justify a temporary stop of Barnes. We believe he would. Agent McEntire testified that he

---

**1.** "A pretextual stop is made when the police use a legal justification to make a stop in order to search or interrogate a person for an unrelated serious crime for which they do not have a legal basis to stop the suspect." (Dist.Ct. order, May 19, 1989).

had received information from four different sources, including the Cincinnati Police Department, that a shooting had occurred outside Cincinnati, Ohio. The shooting involved members of the Iron Horsemen and the Outlaws Motorcycle Club, and members of both of the motorcycle clubs had been killed and wounded. Cincinnati law enforcement officers also informed Agent McEntire that several members of the Iron Horsemen who were involved in the shooting were from Memphis, Tennessee.

Agent McEntire also had specific information from reliable informants concerning Barnes. The agent had received information from informants both prior to and after the shootings in Cincinnati. The three informants with whom Agent McEntire worked had given him reliable information in the past, which had resulted in the arrest of other individuals. These informants had told Agent McEntire that prior to the shooting the defendant was seen carrying firearms on every occasion that they had seen him. Almost immediately after the shootings had occurred in Cincinnati, the same informants told Agent McEntire that the defendant again was carrying firearms, and that the members of the Iron Horsemen and the Outlaws Motorcycle Club were gathering weapons in order to retaliate against each other in the Memphis area. Agent McEntire also received information from the chief of police in Lexington, Tennessee, which related to the same motorcycle gangs. Agent McEntire did not know if this investigator's informant was reliable. Agent McEntire also knew that Barnes was a convicted felon; however, McEntire did not personally know Barnes or his whereabouts so he could not seek a search warrant. The information he possessed when transmitted to Officers Cupp and Jefferson did provide them with the reasonable suspicion to make a *Terry* stop of Barnes. Finding the firearm during the investigative stop provided the necessary probable cause to make an arrest.

### III.

▋ We now turn to the sentencing issue. Our starting point is our decision in *United States v. Joan*, 883 F.2d 491 (6th Cir.1989), where we set forth the framework for the analysis of an upward departure from the guidelines. We apply a three-part test. The first inquiry, which we review as a question of law, involves whether the case is sufficiently unusual to warrant a departure. The second inquiry, which we review under a clearly erroneous standard, asks whether the circumstances that would warrant departure actually exist. Third, we review the actual departure made against a standard of reasonableness. "This third step involves what is quintessentially a judgment call." *United States v. Diaz–Villafane*, 874 F.2d 43, 49 (1st Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 177, 107 L.Ed.2d 133 (1989).

Upon reviewing the district court's rationale for the departure made here, we conclude that it passes the *Joan* test. The defendant had at least three prior felony convictions. Two of the prior convictions were for violent crimes. In addition, Barnes had a prior conviction for being a convicted felon in possession of a firearm. In making the upward departure, the district judge based his decision on the fact that the defendant was convicted of being a felon in possession of a firearm, had served 17 months and 7 days of a two-year sentence, and had been out of prison only two months before being arrested in possession of the firearm at issue here. The prescribed guideline range would have resulted in a sentence less than the sentence the defendant received on his prior conviction for the same offense. This is clearly the type of unusual circumstance that justifies an upward departure from a particular guideline range. A sentence of 27 months, in light of the fact that Barnes received a 24–month sentence for his prior felon in possession of a firearm conviction, meets the standard of reasonableness required by *Joan*.

AFFIRMED.

RYAN, Circuit Judge, concurring separately.

While I concur fully in the court's disposition of the issues presented in this appeal

and in the analysis employed in part II of my brother's opinion, I do not, as to the sentencing guideline issue, subscribe to the analysis set forth in *United States v. Joan,* 883 F.2d 491 (6th Cir.1989).[1]

*Joan* adopted an unnecessarily complex and insufficiently deferential analysis for the review of sentencing guidelines issues. It requires the appellate court, when reviewing sentencing guidelines appeals, to apply three separate standards of review in the same case: *de novo,* clearly erroneous, and reasonableness.

Under *Joan,* step one (whether the case is sufficiently "unusual" to warrant a departure), whatever that means, calls for *de novo* review; step two (whether the circumstances that would warrant a departure "actually exist") requires review under a clearly erroneous standard; and, step three (whether the departure made is "reasonable") is "a judgment call." 883 F.2d at 494, *citing United States v. Diaz–Villafane,* 874 F.2d 43, 49 (1st Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 177, 107 L.Ed.2d 133 (1989).

The three-step analysis in *Joan* apparently was first conceived by a panel of the First Circuit in *United States v. Diaz–Villafane,* 874 F.2d at 49, and was expressly adopted in *Joan* as being "a highly intelligent, thoughtful exposition of the basis for departure" in sentence guideline cases. 883 F.2d at 494.[2] While it indeed may be that, it is not, in my judgment, a practical, legally sound, or sufficiently deferential analysis for reviewing trial court sentencing decisions.

## I.

It is too late in the day to question, at least at this appellate level, the wisdom of Congress' broad policy judgment that so-called disparity in sentencing is an evil to be eliminated in the federal criminal justice system. Whether anything was "broke" and, if "broke," whether the sentencing guidelines fixed it, are questions now beyond this court's competence.

The United States Sentencing Commission's response to Congress' mandate to eliminate sentence disparity is, of course, the sentencing guidelines. Undoubtedly, the commission's attempt to anticipate every nuance of criminal conduct for every crime named in the United States Code and elsewhere and to quantify every shade of criminal culpability has brought greater uniformity to criminal sentencing in the federal courts. Whether the complex matrix of presumptions, rules, regulations, and arithmetical formulae that comprise the sentencing guidelines have enhanced or diminished substantial justice in federal court sentencing is another matter.

In carrying out Congress' command to eliminate much of the disparity in federal court sentencing, the sentencing commission appreciated, wisely, that there is disparity and there is disparity: some sentence disparity is unreasonable, some, perhaps most, is not. Fortunately, the sentencing commission recognized what every experienced trial judge has always known: sentencing is an art, not a science. In recognition, the commission adopted an elaborate scheme to enable sentencing judges to depart from the rigid sentencing guidelines formulae when justice requires. *See United States Sentencing Commission's Sentencing Guideline Manual,* §§ 5K1.1–5K2.15 at 5.41–5.47 (rev. ed. 1989). Whether the departure is upward or downward from the legislated sentencing range and whether dictated by the addition or subtraction of points to establish an individualized total offense level, the departure decision is inherently discretionary.

---

**1.** *Joan* is an "upward departure" case, but its three-part test is being applied in this court to upward and downward departure appeals. *See United States v. Hays,* 899 F.2d 515 (6th Cir. 1990), *United States v. Brewer,* 899 F.2d 503 (6th Cir.1990). Because of the broad sweep of its three standards of review in one, *Joan* will undoubtedly appeal to some as suitable for reviewing other sentencing guidelines issues as well.

**2.** The three-part *Diaz–Villafane* standard was first applied in this circuit in *United States v. Rodriguez,* 882 F.2d 1059 (1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1144, 107 L.Ed.2d 1048 (1990), but without discussion of its relative merit and without any express statement of adoption for this circuit.

See United States v. Hays, 899 F.2d 515, 519 (6th Cir.1990); Joan, 883 F.2d at 496 (quoting Diaz–Villafane, 874 F.2d at 52); United States v. Rodriguez, 882 F.2d 1059, 1066 (6th Cir.1989), cert. denied, — U.S. —, 110 S.Ct. 1144, 107 L.Ed.2d 1048 (1990); United States v. Allen, 873 F.2d 963, 966 (6th Cir.1989). Although it involves certain arithmetic calculations and, as with all discretionary judicial decisions, requires some preliminary fact-finding, in the last analysis sentencing guidelines departure decisions are essentially discretionary judgments incorporating a host of relevant variables that enable the sentencing judge to settle upon a sentence that responds more to the demands of individual justice than to the abstract congressional policy of sentence uniformity. The departure authority granted to sentencing judges is the individualized justice component that enables judges to tailor the sentence to a particular defendant for a particular crime, taking into account the unique factors relevant to each. That is the art of just sentencing.

Just as such sentencing presumes a substantial amount of discretion in the sentencing court, if it is to work it requires a substantial amount of deference to that discretion on appellate review. But Joan, with its three-prong, three-standards-of-review-in-one methodology borrowed from Diaz–Villafane, makes no mention at all of an abuse of discretion standard of review at all and, instead, mandates a division of the sentencing judgment into three parts with a different standard of appellate review for each.

The sentencing decision has, to be sure, a number of components: statutes, guidelines requirements, judicial experience, the trial court's sense of justice, and the countless unquantifiable nuances of victim, defendant, and community interests. But, as with any complex decision-making process having numerous components, the sentencing decision is a unitary, heavily discretionary judgment call. The Joan sentence review formula artificially fragments that unitary judgment call into three discrete components each having a different standard of review, it ignores the real elements of trial court sentencing, and it minimizes the significance of the discretionary component.

II.

Of the ever-increasing volume of sentencing appeals to this court, the vast majority are cases in which the accused or the government complains of the sentencing court's decision relating to upward or downward departures from the agreed sentence range, or of the addition or subtraction of "points" from the base offense level. Both kinds of sentencing decisions are being referred to as "departures." In the vast majority of these appeals, the departure decisions, while always rooted in the statute creating the sentencing guidelines and the guidelines themselves, involve judgment calls: discretionary decisions. By superimposing over the trial court's essentially discretionary judgment a fragmented, three-part review formula that calls for application of three different standards of review in every appeal, there is created a convoluted intellectual exercise that is an open invitation to appellate courts to substitute their sentencing judgment for the trial court's. Appellate judges who would have sentenced the accused differently than the trial court did will have no trouble finding a way to do so when the lower court's sentencing decision is reviewed partly de novo, partly on a clearly erroneous standard, and partly on a determination whether the trial court's "judgment call" was "reasonable."

III.

There is a simpler, fairer, and, to me, more sensible approach to the appellate court's statutory responsibility to review sentencing guidelines cases. That approach would require the appellate court to determine the standard of review in each case by first determining the precise sentencing issue presented on appeal. If the claim on appeal is that the sentencing court did not observe the requirements of Title II of the Comprehensive Crime Control Act of 1984, known as the Sentencing Reform Act

of 1984, Pub.L. No. 98–473, 98 Stat.1987, 18 U.S.C. § 3551, *et seq.*, or the sentence guidelines regulations, the standard of review would be *de novo*. However, if the essence of the appeal, stripped of its appellate rhetoric, is that the district court lawfully departed from the guidelines by considering matters not taken into account in the sentence guidelines regulations but departed to an extent thought by the appellant to be too harsh or too lenient, the review would be for abuse of discretion.

Occasionally a sentencing guidelines appeal will present an issue, properly framed, of whether the district court made findings of fact in the sentencing process that are not supported by the evidence. In such rare instances, a clearly erroneous standard of review would, of course, apply.

Experience, as well as common sense, suggests that it will be an extremely rare sentencing guidelines appeal in which there are raised properly framed issues relating to all three of the sentencing issues raised *sua sponte* in every case by the *Joan* formula: a challenge to the trial court's application of the sentencing guideline law (*de novo* review), a challenge to the court's findings of fact as being unsupported in the record (clearly erroneous standard of review), and a challenge to the leniency or severity of the sentence—the court's judgment call (reasonableness standard of review). I would allow the appellants to decide which sentencing guideline issues they wish to raise, and then employ, upon review, whatever standard of review is dictated by the specific issue raised.

In this case, *for example,* the only sentence issue raised on appeal is that the court's "upward departure to twenty-seven months was not justified under the circumstances in the case and the recommendations according to the sentencing guidelines." In explication, the defendant argues that the "defendant's prior criminal history is less serious than was the defendant's in *Joan*"; that "no aggravating circumstances existed in the present offense"; and that "the government did not recommend upward departure." To the extent that the defendant's argument raises any

appellate issue at all, it appears to be that the sentencing court abused its discretion in departing upward to the extent of imposing a sentence of twenty-seven months when the guidelines called for a range of twelve to eighteen months.

The defendant does not claim that the law does not permit the trial court's departure decision (hence no *de novo* review) or that the facts relied upon by the court for its departure decision are nonexistent (hence no clearly erroneous review).

While the defendant does not employ the term "reasonable" in complaining of the court's departure decision, it can fairly be inferred that the argument that the departure "was not justified under the circumstances" is a claim that the departure sentence was not reasonable. However, since, historically, appellate courts review discretionary "judgment calls" upon an abuse of discretion standard and not by an evaluation for reasonableness, I would review the sentence issue in this case by testing the district court's decision for abuse of discretion and conclude that there was no abuse.

## IV.

Continued application of *Joan* with its three standards of review, offering something for everybody—indeed everything for everybody—is not likely to result in the narrowly focused, deferential appellate review of sentencing guidelines departure decision contemplated by Congress and the sentencing commission. It is also not likely to leave the legally sound, but controversial, disputable, discretionary judgment calls in departure sentencing—the tough ones—where they belong, with the trial courts.