**UNITED STATES of America, Plaintiff,**

v.

**Jesus M. QUIÑONES RODRIGUEZ, Defendant.**

**No. Cr. Nos. 92–348, 93–034 (JAF). Appeal No. 93–1601.**

United States District Court D. Puerto Rico.

June 2, 1994.

See 26 F.3d 213.

Jose A. Quiles–Espinosa, Senior Litigation Counsel, Guillermo Gil, U.S. Atty., and Miguel A. Pereira, Asst. U.S. Atty., San Juan, PR, for plaintiff.

Luis A. Plaza–Mariota, San Juan, PR, for defendant.

*MEMORANDUM DISPOSITION*

FUSTE, District Judge.

On May 20, 1994, a panel of the court of appeals announced its decision affirming this court's upward sentencing departure and requesting further explanation on the reasonableness of the extent of the same. *U.S. v. Jesus M. Quinones Rodriguez*, 26 F.3d 213 (1st Cir.1994) The district court was granted twenty days to comply with the appellate request. The court of appeals retained appellate jurisdiction. This court now complies with the request contained in the limited remand.*

In *United States v. Diaz–Villafane*, 874 F.2d 43 (1st Cir.1989), the Sentencing Guidelines grid yielded a sentencing range of 27–33 months. Since the district court articulated valid reasons, a 120–month sentence was affirmed (264% increase in the punishment). In the present case, a sixty-percent increase in the overall quantum of punishment was reached following the mandate of *Diaz–Villafane*. There, the court of appeals stated:

[T]he process, ..., comprises three steps.

. . . .

Third, once we have assured ourselves that the sentencing court considered circumstances appropriate to the departure equation and that those factors enjoyed adequate record support, the direction and degree of departure must, on appeal, be measured by a standard of reasonableness. 18 U.S.C. § 3742(e)(2); .... In this context, reasonableness is determined with due regard for "the factors to be considered in imposing a sentence," generally, [footnote making reference to 18 U.S.C. § 3553(a) ] ....

This third step involves what is quintessentially a judgment call. District courts are in the front lines, sentencing flesh-and-blood defendants. The dynamics of the situation may be difficult to gauge from the antiseptic nature of a sterile paper record. Therefore, appellate review must occur with full awareness of, and respect for, the trier's superior "feel" for the case. We will not lightly disturb decisions to depart, or not, or related decisions implicating degrees of departure.

*Diaz–Villafane*, 874 F.2d at 49–50 (citations omitted).

I now expand on the reasons behind the extent of the departure. In so doing, I must summarize some of the facts surrounding the offense of conviction and other pertinent particulars.

Although appeal No. 93–1601 pertains to only one defendant, Jesús M. Quiñones–Rodríguez, the appellate panel should be aware of the fact that Mr. Quiñones–Rodríguez was one of at least three identified members of a carjacking gang that terrorized the metropolitan area of San Juan until apprehended. Other members of the gang were also sentenced contemporaneously with Mr. Quiñones–Rodríguez. David Betancourt–Rivera also pleaded guilty and was similarly sentenced for his participation in Criminal Nos. 92–348 and 93–34 for the same conduct as appellant Quiñones–Rodríguez. In addition, Betancourt–Rivera was sentenced in Criminal No. 93–33, a different carjacking incident where one of the victims, a physician, was shot repeatedly, losing a leg and the movement of an arm among other injuries.[1] As far as we know, Mr. Betancourt–Rivera did not appeal his upward-departure sentence. The third known member of the gang, David Sustache–Rivera, was tried and convicted in Criminal No. 92–348 (same case as appellant Quiñones–Rodríguez), in Criminal No. 93–32 (a run-of-the-mill carjacking), and Criminal No. 93–33 (the physician's case). Mr. Sustache–Rivera appealed his conviction and

---

* On June 8, 1994, the court of appeals entered an order finding the reasoning contained in this memorandum disposition persuasive. Consequently, the appellant's sentence was affirmed.

1. Honesty in sentencing is the norm. I state that during the many status conferences held in the physician's case and in the other related cases, with counsel for all defendants present, information was brought up to the effect that it was possible that defendant-appellant Quiñones–Rod-

ríguez participated in said carjacking but could not be identified. Although I suspected his involvement from my independent analysis of these cases, I certify that I did not consider such suspicions in determining the extent of the departure. *See United States v. McCarthy*, 961 F.2d 972, 978–79 (1st Cir.1992); *United States v. Berzon*, 941 F.2d 8, 16–17 (1st Cir.1991); *United States v. Curran*, 926 F.2d 59, 63 (1st Cir.1991).

sentence and the same is pending disposition by the Court of Appeals under No. 93–1669. During the court's exposure to these related cases, this district judge was able to evaluate on a first-hand basis the brutal and egregious nature of the gang's activities and the conduct of its known participants.[2] Concentrating on appellant Jesús M. Quiñones–Rodríguez, we expand further on the factual scenario of Criminal Nos. 92–348 and 93–34 as part of the process of justifying the reasonableness of the departure.

### Criminal No. 92–348

As the appellate panel is aware, on November 8, 1992, at around 1:30 A.M., the victims, Rafael Román–Ruiz and José Iván González–Martínez, longshoremen working a night shift at the waterfront in San Juan, Puerto Rico, decided to leave the pier to buy "lunch". They reached a busy intersection in metropolitan San Juan in a 1992 Nissan Pathfinder driven by its owner, victim Rafael Román–Ruiz. They stopped at a traffic light and the driver's side was opened suddenly by a carjacker. The carjacker hit Mr. Román–Ruiz on the head with a firearm, leaving this victim semi-unconscious. Mr. Román–Ruiz was pushed out of the driver's seat into the back seat of his vehicle while being ordered not to look at the carjackers. The passenger victim, Mr. González–Martínez, observed appellant, Jesús M. Quiñones–Rodríguez, pointing a cocked, long-barrelled revolver at Mr. Román–Ruiz and eventually getting into the driver's seat of the Pathfinder. Mr. González–Martínez later identified a second individual, David Sustache–Rivera, come up the passenger side of the vehicle, demanding to be let in. Sustache–Rivera gained access into the vehicle, climbing into the back seat with victim Román–Ruiz, who was still in stupor from the blow to his head. He was motionless with his head down and totally incapable of defending himself.

Appellant Quiñones–Rodríguez drove the Pathfinder to an area in Santurce, Puerto Rico, known as "La Colectora". To local residents, "La Colectora" is an extremely dangerous neighborhood where drugs and murders are the order of the day. It is a remote location with difficult access and with no police presence. The place serves as a traditional drug point and he who enters the area is totally at the mercy of the criminal element. At "La Colectora", several individuals, one of them also armed with a gun, approached the vehicle and talked to the carjackers. It was at this point in time that appellant Quiñones–Rodríguez accidentally shot himself received slight injuries while attempting to start the Pathfinder. When this happened, Sustache–Rivera ordered the victims out of the car and, at gunpoint, instructed them to sit down in the middle of the street. The victims were robbed of their belongings and the Pathfinder was also taken, only to be recovered stripped and useless near El Yunque Rain Forest a number of days later.

While the victims sat in the middle of the road surrounded by armed individuals, a drug-point outlook yelled that the police was on the way. As some people ran away and the victims attempted to stand up, another identified carjacker, David Betancourt–Rivera, raised his revolver at a distance of fifteen to twenty feet from the victims to shoot them. He fired three shots and missed, but one of the bullets slightly scraped Mr. González–Martínez. The confusion created by the shots and the alleged arrival of the police allowed the victims to flee the area and in this judge's opinion, to miraculously save their lives. Our experience is that in ninety percent, not to say in most, of the carjackings where the victim is abducted, death or serious bodily injury results.

On December 8, 1992, victim González–Martínez was able to identify the carjackers. The other victim, Rafael Román–Ruiz, could never identify the carjackers. At all times he was stunned from the severe head blow inflicted upon him.

The ordeal and abduction suffered by these victims lasted about an hour. While on the Pathfinder and on the way to "La Colectora", the victims were constantly threatened

---

**2.** *See* footnote 1. Since these cases were handled on a consolidated basis, counsel for the various defendants were fully aware of the various factual developments in the respective cases. David Sustache–Rivera went to trial in Criminal No. 93–33 because I refused to accept his guilty plea.

with death. If need be, their heads would be blown away, they were told. Mr. González–Martínez strongly believes that the carjackers truly intended to murder both of them.

During the various episodes in these consolidated proceedings, as well as at the trial of David Sustache–Rivera, this judge was able to appreciate the severe impact this carjacking had on the victims. Mr. Román–Ruiz refused to talk about the ordeal. He could not figure out or explain what had happened. In the presence of his assailants, he appeared terrified and incapable of answering the most basic question. Mr. González–Martínez had intense emotional complications. This hard-working longshoreman became extremely fearful about working night shifts, could not sleep, suffered from great anxiety, and his relationship with coworkers was affected. His psychological injury has manifested itself in his physical health in the form of cardiac and endocrinological manifestations. His wife confirmed that the carjacking has had an adverse effect on her and the children. Mr. González–Martínez has reached an obsession level in not allowing his adolescent children out during the evening hours.

### Criminal No. 93–34

On November 6, 1992, at around 11:30 P.M., Mr. José Luis Muñoz–Guardiola was returning home after dropping off a business acquaintance at one of the local hotels in San Juan. After driving his 1991 Chevrolet Blazer westbound on Baldorioty de Castro Avenue, he exited into Robert H. Todd Avenue and took some shortcuts to avoid traffic. All of a sudden, he observed two cars apparently following him. Since the road was narrow, he pulled over to let the automobiles pass. The first vehicle, a red Toyota Tercel with three passengers, pulled up in front of his vehicle and blocked his path. The second vehicle, a white Honda Accord with three additional individuals, pulled up on the driver's side of Mr. Muñoz–Guardiola's Blazer. A person later identified as David Betancourt–Rivera, who sat on the passenger's side of the white Honda, opened Mr. Muñoz–Guardiola's driver's side door and pointed a revolver at him while yelling and commanding that he open all doors or be killed. The second individual, identified as appellant Jesús M. Quiñones–Rodríguez, got out of the back seat of the Honda on the driver's side and ran around to the Blazer's right-side passenger door. Mr. Muñoz–Guardiola unlocked his car's doors as ordered and Quiñones–Rodríguez climbed into the front passenger seat and immediately struck Mr. Muñoz–Guardiola in the face with a revolver, cutting his lip and causing a bleeding nose.

Mr. Betancourt–Rivera climbed into the back seat of the Blazer and pushed his gun into Mr. Muñoz–Guardiola's head while instructing him to drive. The carjackers forced Mr. Muñoz–Guardiola to drive around the metropolitan area. He was repeatedly told he was going to be killed. His wallet was taken from him and some unimportant contents thrown around the vehicle. The Honda Accord followed the victim's vehicle and the carjackers communicated between the two cars by signals.

After driving around for some time, Mr. Muñoz–Guardiola was instructed to stop at a narrow alley located in a dangerous neighborhood behind the old Corona Brewery, right where "La Colectora" begins. Mr. Muñoz–Guardiola was ordered to move into the rear seat while Betancourt–Rivera assumed the driving position. Appellant Quiñones–Rodríguez moved into the back seat along with the victim, Mr. Muñoz–Guardiola, while a third unidentified male climbed into the front passenger seat. At this point in time, the carjackers could not fully close one of the Blazer's doors, causing the interior light of the vehicle to constantly flicker. One of the carjackers told Mr. Muñoz–Guardiola to hold the door shut and if it opened and the interior light went on, they would kill him.

While the vehicle pulled the door closed, the carjackers continued riding around the Santurce area with Mr. Muñoz–Guardiola hostage. The three carjackers appeared to be extremely agitated and constantly threatened to kill Mr. Muñoz–Guardiola unless he furnished more money for the purchase of drugs. At one point, Mr. Muñoz–Guardiola pleaded for his life—he had a wife and son. One of the carjackers expressed that from his wallet documents they could tell his ad-

dress. They had his home keys and the carjackers threatened to dispose of his wife and kid once they finished him up.

Among Mr. Muñoz–Guardiola's belongings the carjackers found an ATM bank card. One of the carjackers told Mr. Muñoz–Guardiola that if he did not provide an additional $100, they would kill him. The carjackers left the Santurce metropolitan area en route to the Río Hondo area of Bayamón at high speed. The Honda Accord followed. When they arrived at the Río Hondo Shopping Mall, they drove around looking for an automatic bank teller machine. After selecting one of the ATM tellers at the shopping mall parking lot, one of the individuals pointed a short-barrel revolver at Mr. Muñoz–Guardiola and demanded his personal identification number so as to access the ATM terminal. The carjacker attempted to use the card but failed. Mr. Muñoz–Guardiola was then struck with a revolver and told that if he did not withdraw $100, they would kill him. The victim attempted to withdraw money, while advising the carjackers that he did not have enough money in his account. On his first attempt, Muñoz–Guardiola failed. He could not withdraw money. He was so frightened that it took an additional beating and a second try to retrieve $70.

Just as the carjackers were about to speed away, a Ford Tempo with a couple inside pulled up at the adjacent ATM terminal. The carjackers decided to rob the couple. A number of carjackers from the Blazer and the Honda Accord ran over to the Ford Tempo and began beating the driver of the car. They apparently forced the victims to withdraw money from the ATM terminal. The carjackers returned to the Blazer and the Honda and Betancourt–Rivera drove the Blazer on Road 22 back to San Juan, followed by the White Honda and another related vehicle.

After traveling a short distance, the carjackers reduced speed. Mr. Muñoz–Guardiola had pleaded for them to let him go and the carjackers in the Blazer decided to let him jump out. Mr. Muñoz–Guardiola ran into the bushes and, as he tried to escape, he heard the appellant exiting one of the vehicles, demanding an explanation from Betancourt–

Rivera as to why he had allowed Muñoz–Guardiola to escape. Muñoz–Guardiola kept on running away from the road and heard all the vehicles speed away in the direction of San Juan.

Mr. Muñoz–Guardiola was picked up by a passing motorist and was taken to a toll station on Road 22. The police was called and he was then taken to the hospital, where his cuts were sutured and his wounds cleaned and dressed. Eventually, Mr. Muñoz–Guardiola identified appellant Quiñones–Rodríguez as one of the carjackers.

Mr. Muñoz–Guardiola was brutally and viciously beaten, having received hard blows to his face and head. At all times, the carjackers used cocked handguns to beat him during the three-and-a-half-hour ordeal. He was constantly threatened with death. The victim stated that the carjackers clearly appeared to have experience in this kind of operation. Their coordination and the roles played by the various participants so confirmed. The carjackers enjoyed what they did. Mr. Muñoz–Guardiola stated that the attack on the Ford Tempo couple was brutal. At a given time, the carjackers forced him to put his finger in the barrel of a .357 revolver. In addition to the many bodily injuries he received, he required dental work, in order to save his upper teeth. Although full physical recovery was attained, a surgical scar is visible around his lips.

After the incident, Mr. Muñoz–Guardiola and his family began received threatening telephone calls. The traumatizing ordeal and the threatening telephone calls were emotionally disturbing to the victim and his family. Both his wife and his six-year-old son were emotionally affected and started to display attitudes of distrust, hostility, and anger towards suspicious strangers. Mr. Muñoz–Guardiola suffers from severe anxiety, stress, and flashbacks related to the offense conduct. At the time in which appellant Quiñones–Rodríguez was sentenced, the victim was attending weekly psychological therapy sessions in an effort to overcome the emotional trauma he suffered.

### *Extent of the Departure*

Under these circumstances, I was fully convinced at the time of sentencing, and remain convinced today, that the extent of the departure was reasonable. These cases are atypical. The appellate panel so recognized. The conduct significantly differed from what one would expect to be the norm considered by the Sentencing Commission. These two carjackings involved lengthy ordeals and the risk of death or greater bodily injury was imminent throughout every minute of these abusive interventions.

These carjackings were perpetrated by the appellant and a gang of cold-blooded criminals who had at their disposition several vehicles and a number of weapons. Their activities were well organized. The appellant and his associates possessed extensive and impressive criminal records.[3] The appellant endangered the public safety. They roved the streets looking for victims. The number of repeated carjackings is impressive. The effect the criminal activity had on others is unimaginable.

The psychological impact on the victims was evident to this judge. I must confess that my soul froze as these stories unfolded, they being a constant reminder of how dangerous the streets of our national communities are these days. The totality of the circumstances warrants that such egregious conduct and the seriousness of the offenses committed be carefully weighed and punished. The need for punishment is an immediate consideration, but equally important is the need for deterrence. All the participants in this series of carjackings were similarly sentenced. This judge tried his best to individualize each case and to avoid unwarranted disparity in sentencing. The sentence imposed upon the appellant reflects the seriousness of his offense conduct, hopefully promoting deterrence and respect for the law. In addition, the sentence reflects just punishment for the appellant's brutal behavior. The sentence also protects the public from further crimes by the defendant. The appellant, a young, twenty-one-year-old violent criminal, must be kept away from the streets for a long time, and the extent of the departure hopefully guarantees that.

After having presided over these and the related cases, I can only reiterate, having met the appellant and the other perpetrators of these horrendous crimes face-to-face, that it would have been thoughtless on my part to sentence the appellant differently. For these reasons, after much thought, and after having rejected the first round of presentence reports and harsher sentencing recommendations, I am firmly convinced that "[a] 336-month prison term [ ] equivalent to a sentence for each offense at the low end of the GSR, served consecutively" for separate, distinctly-different carjacking offenses, was proper. *United States v. Jesús M. Quiñones–Rodríguez*, 26 F.3d 213, 215 (1st Cir. 1994). Our national communities cannot withstand such actions where human life and human dignity are dragged at the lowest levels by this kind of violent act.

---

**3.** The criminal records were considered as part of the criminal history. No double counting took place, but one must point such records out in order to convey the picture of dangerousness.