**UNITED STATES of America, Plaintiff,**

v.

**Alejandro DIAZ–BASTARDO, Defendant.**

**Crim. No. 90–129 (JAF).**

United States District Court, D. Puerto Rico.

June 4, 1991.

new trial based on new evidence." Trial Tran-   script, Motions and Sentencing Volume, at 3.

**1228**

Ernesto Hernández, Asst. U.S. Atty., and Daniel F. López-Romo, U.S. Atty., D. Puerto Rico, San Juan, P.R., for plaintiff.

Raymond Rivera–Esteves, Bayamón, P.R., for defendant.

**OPINION AND ORDER**

FUSTE, District Judge.

Defendant Alejandro Díaz–Bastardo was convicted of all five counts of an indictment charging him with violation of 8 U.S.C. § 1324(a)(1)(A).[1] On August 7, 1990, a sentencing hearing was held at which time defendant was sentenced to a five-year term of imprisonment and a three-year term of supervised release. While his conviction was affirmed by the United States Court of Appeals for the First Circuit, *United States v. Díaz–Bastardo*, 929 F.2d 798 (1st Cir.1991), the court vacated the sentence and remanded for further proceedings. The Court of Appeals ruled that, since the sentence imposed rested upon both valid and invalid grounds, rather than rule on the propriety of the upward departure, it would be best to allow the sentencing judge "to determine whether a departure might lie, and should be essayed, on the ground of danger." *Id.*, 929 F.2d at 800–801. Following the mandate of the First Circuit, a resentencing hearing was held on May 30 and June 3, 1991. The court heard testimony from an Immigration Special Agent and from the defendant. Based on the circumstances outlined below, we again find that an upward departure is warranted in the case of this defendant. Because this court is concerned with the all-too-frequent practice of the illegal transportation of aliens for profit between the Dominican Republic and Puerto Rico in unsafe conditions, our findings and analysis relating to the upward departure will be detailed before imposing sentence.

### I. *The Context in Which Offense Took Place*

During the pendency of these proceedings, this court has had the opportunity to seriously reflect on the nature and consequences of the specific criminal activity which resulted in the conviction of defen-

---

1. The statute provides in pertinent part:
   (1) Any person who—
   (A) knowing that a person is an alien, brings or attempts to bring to the United States in any manner whatsoever such person at a place other than a designated port of entry ..., regardless of whether such alien has received prior official authorization to come to, enter, or reside in the United States and regardless of any future official action which may be taken with respect to such alien; ... shall be fined in accordance with Title 18, or imprisoned not more than five years, or both, for *each* alien in respect to whom any violation of this paragraph occurs.
   8 U.S.C. § 1324(a)(1)(A) (emphasis added).

dant Díaz–Bastardo. Appended to this opinion are two April 1991 articles from The San Juan Star, a local Puerto Rico newspaper, which describe in graphic detail a voyage from the Dominican Republic to Puerto Rico in wooden boats similar to the one used in the present case. During the hearing, pursuant to Fed.R.Evid. 201 we took judicial notice of facts generally known within the territorial jurisdiction of this trial court, similar to those arising from the appended articles. During sentencing, this court's comments, based on these facts, were not objected to by the parties and so form part of the findings. As a matter of fact, defense counsel agreed that quite often we hear of loss of life by drowning in shark-infested waters, a tragedy closely resembling that of slave-trafficking years ago.

According to a Dominican Civil Defense official, four-hundred to five-hundred Dominicans set sail for Puerto Rico each week in thirty to thirty-five foot boats, while United States authorities estimate the figure to be 2,500 per month who attempt the crossing. Of these numbers, the Dominican officials estimate that 30% arrive safely in Puerto Rico, 60% are stopped somewhere along the dangerous Mona Passage, and 10% drown. While the Immigration and Naturalization Service ("INS") has deported almost 2,000 Dominicans since October 1, 1990 and caught a total of 3,475 in 1990, U.S. authorities estimate that only 10% of those who make the crossing are caught. The Dominican authorities have estimated that 10,000 Dominicans have drowned in the last ten years while attempting to make the crossing to Puerto Rico.

Even if the numbers are not 100% accurate, both U.S. and Dominican officials are painting a picture of tens of thousands of persons who, in their quest for a better life in the United States, have risked their lives to enter Puerto Rico. Once here, Puerto Rico becomes the gateway to the Continental United States. It is in this context that we must examine the circumstances involving the illegal conduct of those who would profit from this sense of desperation (to escape from intolerable situations) and desire (for a better life in the United States) by placing so many lives in such serious jeopardy. It is our own judgment that this court stands remiss for not earlier highlighting the magnitude and the seriousness of this problem. Because we have failed to adequately detail the circumstances surrounding these smuggling voyages, the appellate court has not had before it the "unique factors" which surround these trips between the Dominican Republic and Puerto Rico. It is with this "lens" that we "focus" our sentencing findings in the present case.

## II. *Sentence*

### A. Guidelines Calculation

The base level for each count of conviction has been determined to be 9, since the offenses involved the smuggling of an alien. Based on the defendant's role in the criminal activity wherein he is viewed as the organizer and owner of the vessel, the base offense level is increased to 11 as to each count. As each count of conviction is excludable from the grouping rules of closely-related counts as defined in the United States Sentencing Guidelines § 3D1.2 (rev. ed. Nov. 1990) (hereinafter referred to as "U.S.S.G. §"), each count is treated as a separate and distinct group having the same adjusted offense level of 11. As such, pursuant to U.S.S.G. § 3D1.4, an additional 4-level increase is warranted, thereby establishing a combined offense level of 15. After determining that defendant's Criminal History Category to be I, the guidelines mandate an imprisonment range of 18 to 24 months.

### B. Departure

#### 1. *Standards For Departure*

█ Under 18 U.S.C. § 3553(a), it is the duty of a district court to impose a sentence "sufficient, but not greater than necessary," to comply with certain purposes outlined in the statute.[2] Section 3553(b) requires that a court

---

**2.** These purposes are outlined in § 3553(a)(2) and include "the need for the sentence

imposed—"

shall impose a sentence of the kind, and within the range, referred to in subsection (a)(4) [the Guidelines] unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.

18 U.S.C. § 3553(b). The sentencing court may only use the sentencing guidelines, policy statements and official commentary to determine whether a circumstance was adequately taken into consideration by the Sentencing Commission. *Id.*

In *United States v. Diaz–Villafañe,* 874 F.2d 43, 49 (1st Cir.), *cert. denied,* — U.S. ——, 110 S.Ct. 177, 107 L.Ed.2d 133 (1989), the First Circuit outlined a three-step process to review departures by sentencing courts. First the reviewing court will determine whether the circumstances relied upon by the trial court make the case sufficiently "unusual" to warrant departure. Such review is plenary since determining "whether or not circumstances are of a kind or degree that they may appropriately be relied upon to justify departure" is a matter of law. *Id.* Second, the appellate court must "determine whether the circumstances, if conceptually proper, actually exist in the particular case." *Id.* Because this step involves the trial court in factfinding, the trier's determinations will be set aside only for clear error. *Id.; See* 18

U.S.C. § 3742(e). The third step for the reviewing court, after determining that the circumstances relied upon by the trial court were both appropriate and had adequate support in the record, is to determine whether the direction and the degree of the departure meet the standard of reasonableness. *Id.* As the Court of Appeals opined,

> This third step involves what is quintessentially a judgment call. District courts are in the front lines, sentencing flesh-and-blood defendants. The dynamics of the situation may be difficult to gauge from the antiseptic nature of a sterile paper record. Therefore, appellate review must occur with full awareness of, and respect for, the trier's superior "feel" for the case. We will not lightly disturb decisions to depart, or not, or related decisions implicating degrees of departure.

*Id.* at 49–50.

Subsequently, in *United States v. Trinidad De La Rosa,* 916 F.2d 27 (1st Cir.1990), the First Circuit had the opportunity to apply the *Diaz–Villafañe* departure analysis to the guideline section, U.S.S.G. § 2L1.1(a).[3] After examining the sentencing court's findings, the Court of Appeals found that the Commentary to Section 2L1.1, acknowledging that the Commission has not considered offenses where large numbers of aliens, dangerousness or inhumane treatment is involved, eliminated step one of the *Diaz–Villafañe* analysis.[4] *Id.* at

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

**3.** Trinidad De La Rosa was tried along with the present defendant for the same facts of this case. The appellate opinion there preceded the one in this case.

**4.** Here we note that the Circuit Court quoted Commentary 8 of Section 2L1.1 as stating that "[t]he commission has not considered offenses involving large numbers of aliens *and* danger-

ous *or* inhumane treatment. An upward departure should be considered in those circumstances." (Emphasis in original). In fact, the language of Commentary 8 is completely in the disjunctive: "[l]arge numbers of aliens *or* dangerous *or* inhumane treatment." (Emphasis added). We have examined the Historical Note to Section 2L1.1, Appendix C, No. 37, which states that this note was inserted effective January 15, 1988. We have found no reference in the United States Sentencing Commission Guidelines Manual showing that Commentary 8 had been amended or that a prior version existed, except for a note in *U.S. v. Reyes,* 927 F.2d 48, 52 n. 2 (1st Cir.1991), which refers to an "old version" of Commentary 8 which is no longer applicable. We therefore read Commentary 8 as authorizing an upward departure where any *one* of the three circumstances (large numbers of aliens, dangerousness, inhumane treatment) is found in a particular case.

30. The court went on to find that fifty persons met the "large numbers" requirement and took judicial notice of the fact that fifty-four people crowded into a 34-foot yawl created a dangerous condition, thus justifying the consideration of an upward departure. *Id.* However, the appellate court also found that there was an insufficient factual basis to make a finding that the aliens were inhumanely treated. *Id.* at 30–31. Given that defendant Trinidad De La Rosa did not share responsibility for organizing the trip nor did he have any control over the number of passengers aboard the boat, the Court of Appeals felt that an upward departure in this defendant's case was not reasonable.

More recently, in *United States v. Reyes,* 927 F.2d 48 (1st Cir.1991), the First Circuit again had the opportunity to consider an upward departure in sentencing for a conviction for smuggling aliens by boat from the Dominican Republic. The sentencing court found an upward departure warranted based upon, *inter alia,* both the potential tragic consequences of the voyage and the reckless endangerment of human lives. *Id.* at 51. The court noted that the smuggling of aliens from the Dominican Republic to Puerto Rico, while not necessarily implicating inhumane treatment, "ordinarily involve[s] a large number of aliens aboard unseaworthy vessels and under dangerous conditions, circumstances which might justify a departure in almost every case." *Id.* at 52. The court went on to affirm the trial court's upward departure. *Id.* at 53.

### 2. *Circumstances Warranting Departure in the Present Case*

■ Based on 18 U.S.C. § 3553(b) and U.S.S.G. § 5K2.0, we believe that the circumstances involving Díaz–Bastardo's participation in this offense warrant an upward departure since these "aggravating circumstances" are of a kind that are not taken into account by the Sentencing Commission. Specifically, we find that the departure is warranted based upon both the large number of aliens involved and the dangerousness of the voyage. As to this latter ground, we also find that defendant's

conduct, in drinking and turning over control of the vessel, exacerbated an already dangerous situation.

This court finds that fifty persons meets the "large numbers" requirement contemplated in Commentary 8 of Section 2L1.1. Also, we, like the First Circuit, will take judicial notice of the fact that placing fifty-four human beings in a thirty-four foot, rough, flatbottom, homemade yawl powered by a single, small outboard engine, creates a dangerous condition. *See Trinidad De La Rosa,* 916 F.2d at 30. From law enforcement testimony both at trial and at resentencing, we know the dimensions of the boat and that it was homemade. (Trial Tr. 31, 36; Resentencing Hearing, Testimony Miguel Domingo). Marine Enforcement Officer Casasus also testified at trial that, because it was a homemade boat, its seaworthiness was questionable since such boats are prone to springing leaks, especially when encountering the seas of the Mona Passage. (Trial Tr. 36). In fact, codefendant Hernández testified that the boat was, indeed, leaking and that everyone on the boat was bailing water. (Trial Tr. 78). Also, the lack of any safety equipment—life jackets, radio, food and water—while making a journey of at least ninety nautical miles (closest points land to land) that could take as long as twenty-four hours, (Testimony, Agent Domingo) also added to the element of danger.

As to defendant's conduct, the record is clear that he was the owner of the ship and the organizer of the trip. Testimony of the passengers, as well as his codefendants confirmed these facts. (Trial Tr. 44–48, 57, 67, 73, 78–80, 87). Also, both his own testimony and that of witnesses confirmed that he had been drinking both before embarking on the journey and during the passage. While defendant may have had help in the piloting of the boat, it seems clear that, of the three codefendants, he would have been the most experienced captain. To embark on such a risky venture, being responsible for over fifty lives, and to do so while under the effects of alcohol, represents the type of aggravating circumstances for which departure is warranted.

Our experience here in Puerto Rico with these types of trips convinces us that the basic facts of this case are not atypical of the many voyages attempted from the Dominican Republic to Puerto Rico each year. While we can, in some way, sympathize with the plight of those who might wish to enter our borders in order to seek a better life, we do not find the same level of compassion for those who exploit the situation of others for profit and do so under conditions that, in the end, create the real possibility that lives will be lost. At resentencing, agent Domingo testified that he personally had participated in three rescue operations involving these types of voyages where bodies had been pulled out of the water. To the extent that more severe sentences will deter others from either attempting to organize these trips or, at the very least, motivate organizers and owners to be more safety conscious, we feel that upward departures, under circumstances similar to those found in the present case, are certainly justified.

Therefore, it is the judgment of the court that the defendant is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 48 months as to each of Counts One through Five, both inclusive, said terms of imprisonment to be served concurrently with each other.

Having considered the defendant's financial condition, the court finds that the imposition of a fine is not viable.

Upon release from confinement, the defendant shall be placed on supervised release for a term of three (3) years as to each count, said terms to be served concurrently with each other, upon the following terms and conditions:

1. The defendant shall comply with the standard conditions of supervised release promulgated by the Sentencing Commission and adopted by this court.

2. If deported, or granted voluntary departure, the defendant shall remain outside the United States, and all places subject to its jurisdiction, unless prior written permission to reenter is obtained from the pertinent legal authorities and defendant notifies in writing the Probation Officer of this court to that effect.

Pursuant to Title 18, U.S.Code, Section 3013, a special monetary assessment in the amount of $50.00 as to each count, for a total of $250.00, is also imposed.

IT IS SO ORDERED.

# Boat capsizes, 5 drown west of Boqueron

## Rescuers save 68 illegal aliens from rough seas

By JENIFER McKIM
of The STAR Staff

BOQUERON — Five Dominican women drowned off the coast of Boquerón Friday after an open boat carrying at least 73 illegal aliens capsized alongside a Commonwealth police craft that was trying to help them.

More photos, Pages 4, 5

Sixty-eight people were rescued, including six who were taken to a hospital, according to the U.S Immigration and Naturalization Service's Border Patrol.

The panicked Dominicans also capsized the 22-foot police powerboat Friday morning as they grabbed onto its sides, trying to save themselves from the rough waters of the Mona Passage. Six police officers and the Dominicans spent some 20 minutes floundering in the water eight miles off the coast of Boquerón before help arrived

None of the police officers was injured.

The Dominican men and women, one of whom was pregnant, are part of a steady stream of aliens who risk their lives every day in search of a better life in Puerto Rico and the United States.

"Everybody knows its difficult there," said Dominican Francisco Cruz Wells, 35, who said he attempted the ill-fated trip to earn money to send home to his wife and children.

"Now, I'm going to jail," said Cruz, before being taken away by U.S. immigration officers He will be deported

See DOMINICANS, Page 4

Two Dominicans were in custody Friday after they were rescued off the coast of Boquerón, top photo. Sixty-seven people were rescued and five were known dead after their frail boat capsized and sank. The body of a drowned Dominican was tagged and removed for further identification, left photo.

STAR photos by Tony Pacheco

# Dominicans From Page 1

this morning, the Border Patrol said.

José Méndez, a Border Patrol official, said the Dominicans were mostly from Santo Domingo and Higuey, a small town in the southeastern corner of the Dominican Republic.

The Dominicans said they left Wednesday in a small wooden boat with a 40-horsepower engine, through the Boca de Yuma channel and across the 100-mile-wide, shark-infested Mona Passage toward Puerto Rico's west coast.

Survivors said that the captain of the wooden boat left in the early morning in a rowboat to get gas and did not return. A few hours later a fisherman showed up and began to tow the wooden *yola* ashore.

Walter Andujar, captain of the Boquerón police boat, said he received a distress call from the fisherman about 9.30 a.m. He and his five crew members went to investigate and found the Dominican boat was beginning to sink.

"They panicked, stood up, then started trying to get into our boat," and both boats capsized, said Andujar. He said the two groups remained in the water for some 20 minutes before Maritime Police, the Coast Guard, the Department of Natural Resources and various private boats arrived to help.

None of the Dominicans were wearing life jackets.

U.S. authorities estimate that some 2,500 illegal aliens attempt to cross the dangerous pass every month, and 10 percent are caught. The INS has captured and deported 1,962 Dominicans since Oct. 1, and 3,475 were caught in 1990, Méndez said.

The Dominican Republic Civil Defense estimates that 10,000 Dominicans have drowned attempting the crossing during the last 10 years.

"We were doing fine," said Dominican Maritza López, 32, who said the wake from the police boat caused the Dominican boat to capsize. López, who said she worked in a beauty salon in the Dominican Republic, said she and five girlfriends decided to take the trip to find better paying jobs.

López said she paid some $350 for her passage and was not aware that the trip could be dangerous.

"Now I don't know which of my friends are alive," she said.

Méndez said there is a possibility that the captain left the boat on purpose, leaving the Dominicans to their own mercy. The Dominicans refused to say what happened to the captain, and also said there was another boat of some 50 or 60 people that was not caught, Méndez said.

By 1 p.m., some 60 soggy Dominicans were on their way to Punta Borinquen in Aguadilla and five woman lay dead on the police dock in Boquerón.

Cruz, with $6 in his pocket, was one of the last people to get on the Border Patrol bus to head for Aguadilla. Beside him, a bandaged women groaned and a tall, thin man was passed out.

"I didn't want to get in that boat when I saw how many people were in it," he said.

He showed a soggy letter that his wife had given him before he left, forgiving him for leaving her because conditions were so difficult at home.

Not sure when or whether he would be released, he couldn't say whether he would try the journey again.

Curious bystanders watched as the bodies of the barefoot young women, wearing pants and cotton shirts were carried away.

STAR photo by Tony Pacheco

In above photo, police officer Walter Andújar climbs out of the boat that attempted to rescue the stranded Dominicans. The frantic Dominicans tried to climb aboard the boat and it capsized. Map at left shows course of the Dominicans' boat

**The dotted line shows the passage of the ill-fated vessel that capsized off the coast of P.R..**

Dominican Republic

Higüey

Santo Domingo

Boca de Yuma

Mona Passage

Mona I

San Juan

Puerto Rico

Boquerón

Caribbean Sea

# Illegal alien search on island continues

By JENIFER McKIM
Of the STAR Staff

Ships and helicopters combed the west coast Saturday for illegal aliens from the Dominican Republic after a boat was spotted off mile-wide Desecheo Island, the U.S. Immigration and Naturalization Service's Border Patrol said.

And no more bodies were found in a search off the coast of Boquerón, after five women drowned Friday morning when a boat with some 70 Dominicans aboard sank, said the Border Patrol.

"The Coast Guard and Border Patrol are searching, but [the Dominicans] might have already arrived on shore," said Ivette Capella from Punta Borinquen at the former Ramey Air Force Base in Aguadilla.

Dominican Civil Defense Director Eugenio Cabral said two boats which slipped past authorities Thursday would probably be arriving on Puerto Rico's coast Saturday.

Also, surviving Dominicans from the sunken yola said that they traveled with another boat, which was never found.

These 30-to-35-foot-long fishing boats bring to Puerto Rico some 400 to 500 Dominicans weekly, said Cabral Saturday from the Dominican Republic.

He said some 30 percent of the voyagers arrive and stay on U.S. shores, while 10 percent drown and some 60 percent are stopped somewhere along the dangerous 90-mile journey across the Mona Passage from the Dominican Republic.

The 68 Dominicans seized Friday were on their way to San Juan on Saturday where they would be deported home, said Capella.

Despite one Dominican's fear that he would be put in jail indefinitely upon arrival, Cabral said that is not case "Usually they stay in jail for two days, then they go to court and the judge sets them free," he said. "Most of

STAR photo by Tony Pacheco

Rescue workers carry onto the dock at Boquerón Friday one of the five drowning victims of the capsized boat carrying Dominicans to Puerto Rico.

them pay nothing."

The interdicted Dominicans are fined back in their homeland about about $10, while the captains of the vessels receive a fine of less than $5, he said

The boat in which five young women drowned Friday capsized after the captain allegedly left to get fuel.

A fisherman began to tow the boat ashore, when it began to sink. As a 22-foot police motor boat arrived the panicked Dominicans, trying to get aboard, capsized both boats Six policemen and some 70 Dominicans struggled in the water for some 20 minutes before help arrived. the captain of the boat, Walter Andújar, said Friday.