**UNITED STATES of America, Plaintiff,**

v.

**Ramon HERNANDEZ–COPLIN, Julio Reyes–Acosta, Defendants.**

**Crim. Nos. 92–090 (JAF), 92–173 (JAF).**

United States District Court, D. Puerto Rico.

Sept. 17, 1992.

Edwin Vazquez, Asst. U.S. Atty., Daniel F. Lopez–Romo, U.S. Atty., San Juan, P.R., for U.S.

Laura Maldonado, Asst. F.P.D., San Juan, P.R., for Hernandez–Coplin.

Jose F. Quetglas, San Juan, P.R., for Reyes–Acosta.

### SENTENCING MEMORANDUM

FUSTE, District Judge.

On July 6, 1992, defendant Ramon Hernandez–Coplin pled guilty to four counts of the Indictment in Criminal No. 92–090 and to six counts of the Indictment in Criminal No. 92–173, both charging violations of 8 U.S.C. § 1324(a)(1)(A) and 18 U.S.C. § 2.

According to the Presentence Report (PSR) in Criminal No. 92–090, on April 16, 1992, at approximately 9:00 P.M., a U.S.

Customs Service patrol aircraft detected a rustic, wooden yawl with a number of persons on board, sailing eastbound from the Dominican Republic at 6.1 nautical miles from the coast of Punta Borinquen, Aguadilla, Puerto Rico. The wooden yawl did not display navigational lights.

At 10:00 P.M., the vessel was intercepted by the U.S. border patrol one mile off the coast of Crash Boat Beach in Aguadilla, Puerto Rico. During the interception, the person who appeared to be the captain of the yawl, later identified as Ramon Hernandez–Coplin, covered his head with a raincoat and refused to stop the vessel. Hernandez–Coplin continued to head his boat toward the coastline of Aguadilla, Puerto Rico, and at a given point in time the border patrol boat came very close to the wooden yawl. One of the border patrol agents was able to cut the fuel line that fed gasoline to the yawl's outboard motor. Subsequently, the yawl was taken to Crash Boat beach in Aguadilla, Puerto Rico, and ninety aliens from the Dominican Republic and two Chinese were found to be on board the forty-foot yawl. The agents were able to verify that the yawl was ill-equipped for the 24–plus–hour journey from the Dominican Republic to Puerto Rico. There was no food or water on board; there were no life jackets; and there was no safety equipment, such as radios, lights, and nautical charts, indispensable for a seaworthy, inter-island journey in the Atlantic Ocean.

The defendant, Ramon Hernandez–Coplin, who turned out to be the captain of the yawl, was identified as the same person that on September 8, 1989 had been administratively deported by the U.S. Immigration and Naturalization Service (INS) on a previous alien smuggling trip. On that occasion, Mr. Julio Reyes–Acosta, a codefendant in this case, was identified as the boat's pilot and as Mr. Hernandez–Coplin's assistant.

During the PSR investigation interview, defendant Hernandez–Coplin admitted to the Probation Officer that the April 16, 1992 incident represented his third alien smuggling trip from the Dominican Republic to Puerto Rico. He also admitted that he was the captain of the motor yawl.

The PSR also shows that the INS has processed Mr. Hernandez–Coplin on at least three occasions prior to the commission of the instant offense. Two of the three interventions occurred in international waters and, for that reason, the defendant was merely processed, photographed, and repatriated to the Dominican Republic.

On June 19, 1989, defendant Hernandez–Coplin was arrested near Desecheo Island, on the West coast of Puerto Rico, and was found to be the operator of a yawl with fifty-two nationals of the Dominican Republic being smuggled as illegal aliens into the United States. A criminal complaint was filed, later to be dismissed based on a lack of cooperation by key witnesses. Mr. Hernandez–Coplin was deported on September 18, 1989. The INS investigation confirms that this defendant was identified as a yawl captain for one of the most notorious alien smuggling organizations of the Dominican Republic, headed by one Arturo Nunez. The record shows that both Mr. Hernandez–Coplin and Mr. Julio Reyes–Acosta were detained on April 16, 1992, and have been held in custody since then.

The facts contained in the PSR prepared for Mr. Hernandez–Coplin in Criminal No. 92–173 merit a detailed exposition. According to the PSR, on March 26, 1992, and before the April 16, 1992 incident which we have already described, Ramon Hernandez–Coplin was the master of a forty-foot yawl, powered by a sixty-horsepower outboard engine, that transported ninety-five Dominican nationals who were attempting to enter the United States illegally through Aguadilla, Puerto Rico. At the time the aliens came on board the boat, Mr. Hernandez–Coplin advised the passengers that if apprehended, they were not to identify him as the captain of the vessel. The boat in question was not designed for the transportation of so many passengers in the rough waters of the Mona Passage, part of the Atlantic Ocean between the island of Hispaniola, containing the nations of the Dominican Republic and Haiti, and Puerto

Rico. As in the case described above, the unseaworthy yawl had no radio, life vests, navigational devices, emergency equipment, lights, or signal equipment.

The yawl departed the port of Miches, Dominican Republic, and was spotted by an aircraft several hours before reaching the coast of Puerto Rico. Hernandez–Coplin stopped the vessel and ordered the passengers to stay still to avoid detection by the aircraft. After the aircraft left the area, the wooden boat continued its journey toward Puerto Rico. During the voyage, co-defendant Julio Reyes–Acosta assisted Hernandez–Coplin in the navigation of the yawl. At about midnight on March 26, 1992, the wooden, unseaworthy vessel reached the coast of Aguadilla, Puerto Rico. Upon hearing the noise of an approaching aircraft, codefendant Hernandez–Coplin ordered the passengers to jump into the water so that he could make a fast turnaround back to the Dominican Republic and avoid apprehension. The passengers began to jump into the heavy surf approximately one-hundred yards from the beach. As he maneuvered the boat seaward, a passenger had to submerge into the water to avoid being struck by the boat. Hernandez–Coplin continued ordering the passengers to jump and brandished a gun when some of the passengers hesitated to do so. Some female passengers began to yell that they did not know how to swim, and Hernandez–Coplin forced them to jump into the water. Their pleas for help were ignored—in spite of the fact that at least two female passengers were drowning. Mr. Hernandez–Coplin then initiated his return trip to the Dominican Republic with his assistant and partner, Julio Reyes–Acosta.

On March 27, 1992, at approximately 1:00 A.M., the bodies of two female victims were recovered on the shores of the Ramey golf course, Ramey Air Force Base, Aguadilla, Puerto Rico. At that time, one of the victims was positively identified as having been a passenger of the ill-fated trip. At the sentencing hearing, we received evidence that allowed us to conclude that both female victims were passengers of the boat captained by Hernandez–Coplin on March 26, 1992.

The PSR contains information that the wooden yawl used on March 26, 1992 was the same which was subsequently intercepted during the smuggling attempt of April 16, 1992. The forty-foot yawl, photographs of which we have examined, was poorly constructed, to the extent that the wooden boards, although nailed at traversing beams, were held together with the use of chains. Floor-mop fibers were inserted between the boards as caulking to minimize water seepage. The vessel was operated by a single, forty-horse power outboard engine, without safety equipment of any kind. Ninety-five aliens could hardly fit in this forty-foot boat.

Regarding codefendant Julio Reyes–Acosta, who also pled guilty on July 6, 1992 to both criminal cases, 92–090 and 92–173, we add that on April 22, 1992, Reyes–Acosta was the subject of a one-count indictment in this District in Criminal No. 92–092 (JP), charging that on or about April 16, 1992, Reyes–Acosta, a Dominican national having been previously arrested and deported, reentered the United States without having obtained the proper authorization from the Attorney General of the United States, all in violation of 8 U.S.C. § 1326. Sentencing took place before Judge Pieras on September 8, 1992. It is worth mentioning that at the time the plea agreements for these two defendants were accepted by the court, a stipulated version of the facts was appended to the plea agreements subscribed by the defendants and by counsel. Defendant Reyes–Acosta admitted that in the March 26, 1992 trip, his codefendant Hernandez–Coplin did brandish a gun and did force people literally to jump from the boat, resulting in two persons drowning. Hernandez–Coplin, whose stipulated version of the facts was also signed by him and by his attorney, failed to confirm such incident, although he had signed the stipulated version of facts. The court proceeded to cross out the particular reference to the incident at page 6 of his plea agreement. The record also reflects that at the time Reyes–Acosta was interviewed by the Probation Officer for the preparation of the PSR, he recanted

and seemed to disclaim that he was a witness to the gun incident. On the morning of the sentencing hearing, counsel for Reyes–Acosta, along with the Assistant U.S. Attorney in charge of the case, asked for an in-chambers hearing, where the court was informed that the reason for the change in versions by Reyes–Acosta was his fear of reprisal by codefendant Hernandez–Coplin. The record was developed in open court along those lines.

*Sentencing of Ramon Hernandez–Coplin*

Based on U.S.S.G. § 2L1.1, a Base Offense Level (BOL) of 9 was determined as to each of the indictments. Since Mr. Hernandez–Coplin acted as the captain of the unseaworthy yawl in both cases and had supervisory authority over codefendant Reyes–Acosta,[1] the BOLs were increased in the two cases by two levels pursuant to U.S.S.G. § 3B1.1(c). Hernandez–Coplin accepted criminal responsibility for his involvement in Criminal No. 92–090 (the April 16, 1992 incident) and, therefore, a two-level reduction to the BOL was allowed pursuant to U.S.S.G. § 3E1.1(a). However, since the defendant did not accept full responsibility for his involvement in Criminal No. 92–173 (the March 26, 1992 incident involving gun and drowning), no reduction was granted in said case for acceptance of responsibility.

■ On the basis of adjusted BOLs of 9 and 11, respectively, and a Criminal History Category of I, the guideline imprisonment ranges suggested by the U.S. Sentencing Commission Guidelines Manual for these particular cases ranged from 4 to 10 months as to Criminal No. 92–090, and from 8 to 14 months as to Criminal No. 92–173. The court made an upward departure and sentenced codefendant Hernandez–Coplin accordingly.

The defendant has carried out alien smuggling operations several times. He was involved in prior similar conduct which did not result in criminal convictions. As a boat captain, he placed the lives of many aliens in jeopardy by precariously transporting them in great numbers and under dangerous conditions on unseaworthy vessels that navigated inter-island through the Mona Channel, between the islands of Hispaniola and Puerto Rico, for over twenty-four hours. Pertaining to Criminal No. 92–173, and in order to avoid arrest, defendant Hernandez–Coplin brandished a firearm and ordered yawl passengers to jump into the ocean. As a result, two female passengers who did not know how to swim drowned. This sad reality, partly contemplated by this court in our earlier decision in *United States v. Diaz–Bastardo*, 766 F.Supp. 1227 (D.P.R.1991), allows an upward departure under U.S.S.G. §§ 4A1.3, 5K2.0, and 5K2.1.

Under section 4A1.3, reliable information indicates that Hernandez–Coplin's Criminal History Category does not adequately reflect the seriousness of his past criminal conduct. Under Guidelines section 5K2.0 and *Diaz–Bastardo*, 766 F.Supp. at 1231, we believe that the circumstances involving Hernandez–Coplin's participation warrant an upward departure, since this file is replete with "aggravating circumstances" of a kind that were not taken into account by the Sentencing Commission in drafting the applicable guidelines. Specifically, we find that the departure is warranted based on the large number of aliens involved and the dangerousness of the voyage. The large number of aliens transported in the small, open, unseaworthy, wooden yawl, meets the "large numbers" requirement contemplated in Commentary 8 of U.S.S.G. § 2L1.1. Also, we, like the First Circuit in *United States v. Diaz–Bastardo*, 929 F.2d 798 (1st Cir.1991), take judicial notice of the fact that placing over ninety human beings in a forty-foot, home-made, unseaworthy yawl, powered by a single, small outboard engine, creates a dangerous condition. *See*

---

1. At the sentencing hearing, only Hernandez–Coplin testified. In reference to codefendant Reyes–Acosta he repeatedly described him as his partner, sharing the responsibility of the venture in equal terms with him. The Probation Officer understood that Hernandez–Coplin had some supervisory power over Reyes–Acosta and the preponderance of the evidence is to that effect. We note, however, that Reyes–Acosta's involvement was not an isolated act. He indeed participated in these two alien smuggling ventures.

*United States v. Reyes,* 927 F.2d 48 (1st Cir.1991), and *United States v. Trinidad de la Rosa,* 916 F.2d 27, 30 (1st Cir.1990).

It is evident from this file that this home-made boat, unseaworthy for the journey intended, lacking safety equipment of the most basic kind, creates a situation of obvious dangerousness. *Diaz–Bastardo,* 766 F.Supp. at 1231–32.

In sum, the court finds that in reference to Criminal No. 92–090, the number of aliens smuggled and the dangerous condition in which they were transported, placing their lives at risk, warrant an upward departure to the same imprisonment range of forty-eight months utilized by this court in *Diaz–Bastardo, Id.* at 1232.

Regarding Criminal No. 92–173, the court finds that these same factors apply and, in addition, finds that the defendant's reckless and criminal behavior, which resulted in the death-murder of two human beings, merits an upward departure to the maximum penalty afforded by law for a violation of 8 U.S.C. § 1324(a)(1)(A), that is, imprisonment for sixty months. *See* U.S.S.G. § 5K2.1. When death results, the court may increase the sentence above the authorized guideline range. While loss of life does not automatically suggest a sentence at or near the statutory maximum, we have considered the matters that would normally distinguish among levels of homicide, such as the defendant's state of mind. The extent of the increase made by this court up to sixty months turns upon the dangerousness of the defendant's conduct and on the fact that Hernandez–Coplin, without a reasonable doubt, intentionally and knowingly risked human lives to avoid apprehension. The substantial increase up to sixty months is appropriate because lives were put at risk by this defendant when he put his interests above and beyond the lives of two female victims who were ordered at gunpoint to jump into the ocean in the middle of the night and not knowing how to swim.

2. The other terms and conditions of the sentence, involving fines and supervised release, as well as special supervised release conditions,

Therefore, it was the judgment of the court that the defendant be committed to the custody of the Bureau of Prisons to be imprisoned for a term of forty-eight months as to each of Counts One, Two, Three, and Four in Criminal No. 92–090, said terms of imprisonment to run concurrently with each other, and for a period of sixty months as to each of Counts One, Two, Three, Four, Five, and Six of Criminal No. 92–173, said terms of imprisonment to run concurrently with each other, but consecutively to the sentence imposed in Criminal No. 92–090.[2] *See United States v. Perez,* 956 F.2d 1098, 1102 (11th Cir.1992).

*Sentencing of Julio Reyes–Acosta*

■ Regarding Julio Reyes–Acosta, the provisions of the Sentencing Guidelines establish a BOL of 9 as to both offenses, since each involved the smuggling of aliens, pursuant to 2L1.1. The defendant accepted criminal responsibility for his involvement in the offense conduct in both cases and, therefore, a two-level decrease was allowed in each case, pursuant to USSG § 3E1.1(a).

Based on a total offense level of 7 and a Criminal History Category of I, the suggested guideline imprisonment range for each of these two cases was from 1 to 7 months. Since these offenses involved the smuggling of an extremely large number of aliens on a single engine, forty-foot, unseaworthy yawl not designed to carry that many passengers a long distance, through the shark-infested, treacherous and tempestuous waters of the Mona Passage, a finding of dangerousness to victims was made under *United States v. Diaz–Bastardo,* 766 F.Supp. 1227 (D.P.R.1990), and cases cited therein. We need not repeat the details of how ill-equipped these yawls were. Most regrettably in the case of Reyes–Acosta, the events leading to Criminal No. 92–173 resulted in the death of at least two aliens by drowning. U.S.S.G. § 5K2.1. Although we have found that there is no evidence to establish that this nineteen-year-old defendant insti-

are not treated here. They are contained in the Judgment and Commitment Order entered by the court.

gated or actually forced the passengers overboard, he obviously aided and abetted Hernandez–Coplin in the criminal venture. His assistance in bringing the aliens to Puerto Rico makes him responsible for the events which transpired during the journeys.

Considering the aforementioned facts and U.S.S.G. §§ 4A1.1, 5K2.0, and 5K2.1, as well as the fact that the defendant had previously entered the United States illegally, having been deported, the court understood that an upward departure of a lesser magnitude than the one confectioned for Hernandez–Coplin was in order. As a result of our analysis of this case, the court found that in Criminal No. 92–090, Julio Reyes–Acosta was to be committed to the custody of the Bureau of Prisons for a term of twenty-four months as to each count, said terms of imprisonment to be served concurrently with each other and with the sentence imposed in Criminal No. 92–092 (JP). Regarding Criminal No. 92–173, the defendant was committed to the custody of the Bureau of Prisons for a term of twenty-four months as to each count, said terms of imprisonment to be served concurrently with each other and with the sentence imposed in Criminal No. 92–092 (JP), but consecutively to the sentence imposed in Criminal No. 92–090.[3] *See United States v. Perez,* 956 F.2d 1098, 1102 (11th Cir.1992).

IT IS SO ORDERED.

---

**3.** As in the case of Hernandez–Coplin, we do not treat here the subject of fines and supervised release or supervised release conditions. These are contained in the Judgment and Commitment Order.