June 21, 1994 UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT

 

 No. 92-2228

 UNITED STATES OF AMERICA,

 Appellee,

 v.

 RAMON HERNANDEZ COPLIN,

 Defendant, Appellant.

 

 ERRATA SHEET

 The court's opinion of March 31, 1994, is amended by
inserting a new footnote 9, immediately following "Cf. U.S.S.G. 
 
5G1.2(d)."
at page 20, line 24, which reads as follows:

"[T]he total punishment" under U.S.S.G. 5G1.2 is normally
determined by the guideline range, see id., subsection (b), but
 
where the sentencing court lawfully departs from the guideline
range, "the total punishment" is the punishment specified as a
result of that departure; and sentences then run consecutively
"to the extent necessary to provide a combined sentence equal to
the total punishment." See id. subsection (d).
 

 UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT 
 FOR THE FIRST CIRCUIT
 

No. 92-2228

 UNITED STATES OF AMERICA,

 Appellee,

 v.

 RAMON HERNANDEZ COPLIN,

 Defendant, Appellant.

 

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF PUERTO RICO

 [Hon. Jose Antonio Fuste, U.S. District Judge]
 

 

 Before

 Breyer, Chief Judge,
 

 Coffin, Senior Circuit Judge,
 

 and Boudin, Circuit Judge.
 

 

Laura Maldonado Rodriguez, Assistant Federal Public Defender,
 
with whom Benicio Sanchez Rivera, Federal Public Defender, was on
 
brief for appellant.
Edwin O. Vazquez, Assistant United States Attorney, with whom
 
Guillermo Gil, United States Attorney, and Jose A. Quiles-Espinosa,
 
Senior Litigation Counsel, were on brief for the United States.

 

 March 31, 1994
 

 BOUDIN, Circuit Judge. Ramon Hernandez Coplin was
 

indicted by a grand jury in two separate indictments, each

relating to a separate episode of smuggling aliens into the

United States. The first indictment charged that Hernandez

on April 16, 1992, had been captain of a yawl intercepted a

mile off the coast of Puerto Rico carrying 92 illegal aliens

from the Dominican Republic. The yawl was running without

lights, had no safety equipment and sought to avoid capture.

Hernandez, and his assistant Julio Reyes Acosta, were charged

in four counts with seeking to smuggle four of the alien

passengers into the United States. 8 U.S.C. 1234(a)(1)(A).

 Thereafter, on July 1, 1992, Hernandez and Reyes were

charged in a second indictment with six counts, under the

same statute, for seeking to smuggle six aliens into the

United States on March 26, 1992. On this earlier occasion a

yawl had been used, about the same number of passengers were

aboard, and the same Puerto Rican coastline approached. Two

women drowned that night and their bodies washed up upon the

shore. The yawl made its way back to the Dominican Republic.

As in the earlier indictment, each count related to a

different alien.

 On July 6, 1992, Hernandez pled guilty to all counts of

both indictments pursuant to a plea agreement. In exchange

for the pleas, the prosecutor agreed to dismiss yet another

federal indictment against Hernandez (for illegally

 -2-

reentering the United States after a prior deportation) but

made no other promises. Reyes entered guilty pleas at the

same time. In the change of plea hearing, the government

submitted a written version of what it said its trial

evidence would show. Reyes agreed with the government's

version of events; Hernandez did so only with a

qualification. The present appeal revolves around that

disagreement.

 In substance, Hernandez and Reyes both admitted that

they had been engaged in the smuggling operations charged in

the indictments. As to the March 26 operation, the

government's written version of events included the following

language (the emphasis is ours):

 At approximately midnight and while the yawl was
 approximately 100 yards from the beach at
 Aguadilla, Puerto Rico, an aircraft was heard in
 the vicinity. At said time, the captain of the
 yawl, that was later identified as defendant Ramon
 Hernandez Coplin, initially told the passenger
 (sic) that they must jump into the water because he
 did not want to be arrested. Due to the fact that
 
 some passengers were hesitating to jump, defendant
 
 Ramon Hernandez Coplin drew a gun and ordered them
 
 to jump into the water.
 

 The evidence will show that females were
 yelling that they did not know how to swim or for
 help because they were drowning. Defendant Ramon
 Hernandez Coplin and his assistant, defendant Julio
 Reyes Acosta, who aided and abetted in the piloting
 of the yawl, ignored the pleas of the females and
 continued offshore back to the Dominican Republic
 to avoid arrest.

 At the hearing, the trial judge summarized the

government's proffer, including the portion that we have

 -3-

emphasized, and Reyes agreed (under oath) that the proffer

was accurate. Hernandez' counsel said that Hernandez also

accepted the proffer except that "he [Hernandez] has told me

that at no time did he point a gun at anybody, or, and also

that he did not push off the boat, anybody." The district

judge then said this factual dispute should be the object of

evidence in the sentencing hearing. The district judge then

drew a line through the words emphasized above and Hernandez

signed the amended version of the proffer. The guilty pleas

were then accepted.1

 On September 9, 1992, a sentencing hearing was held for

Hernandez. The government presented as a witness one of the

aliens smuggled into Puerto Rico on March 26; testifying

through an interpreter, the witness said that Hernandez "had

like a revolver in his hand and said, `Everybody jump in,

everybody jump in.'" The witness also testified that "the

ladies were screaming that they were going to drown."

Defense counsel did not cross examine but the district judge

then asked, "Are you sure it was a gun?" The witness

replied, "I knew it as a revolver." 

 

 1Hernandez maintained his position when interviewed by
the probation officer, but the probation officer disbelieved
him. In objections to the pre-sentence report, Hernandez
denied ordering anyone to jump into the water 100 yards from
the beach; asserted that the boat had actually hit the beach;
denied that he had any weapons; and seemingly denied that he
had known that the two women who had died were in danger.

 -4-

 The defense then called Hernandez who testified under

oath through an interpreter. He testified that when the boat

reached the shore "the people got out of the boat quite

comfortably and started heading in land (sic)" and that he

did not hear anyone scream. On cross examination, Hernandez

said, "I never forced anybody, I didn't have a weapon. I

have never used a firearm." Finally, the government called

an agent of the Immigration and Naturalization Service to

refute Hernandez' claims that the boat had reached the shore;

the INS agent, based on the survival of the yawl and on

interviews with six passengers, gave his opinion that the
yawl had not reached the beach in Puerto Rico on March 26.

Reyes was not called as a witness by either side.

 The district judge then made an express finding that

Hernandez had brandished a gun and threatened the two women

who, as a result, jumped into the water and drowned. The

court also inquired into Reyes' failure to appear to reaffirm

his own testimony as to the gun given at the change of plea

hearing, and Reyes' apparent unwillingness to reaffirm that

testimony to the probation officer. Reyes' counsel then

stated that his client told him that "he [Reyes] was afraid

of Mr. Coplin, and that he would not testify in front of Mr.

Coplin as to that matter."

 After allowing defense counsel and Hernandez to speak to

the proper sentence, the court computed the offense levels

 -5-

under the Sentencing Guidelines.2 The court found that the

base offense level was 9 for the March 26 operation and 9 for

the April 16 operation. U.S.S.G. 2L1.1. The court then

increased both offense levels by two points each because of

the supervisory authority Hernandez exercised over Reyes.

U.S.S.G. 3B1.1(c). The court reduced the figure by two

points as to the April 16 operation for acceptance of

responsibility, U.S.S.G. 3E1.1; but the court refused to
make a similar reduction as to the March 26 operation because

Hernandez had not accepted "full responsibility" for his

involvement, "[s]pecifically on the issue of the gun and . .

. the deaths."

 The adjusted offense levels corresponded to imprisonment

ranges of 8 to 14 months for the March 26 operation and 4 to

10 months for the April 16 operation. However, the court

invoked its authority to depart upward, 18 U.S.C. 3553(b),

and it imposed sentences of five years' imprisonment for the

March 26 operation and four years' imprisonment for the April

16 operation, specifying that the two sentences were to be

served consecutively. The court found a departure warranted

in both cases by the very dangerous conditions of

transportation in the yawl (e.g., lack of safety equipment
 

 

 2The 1991 version of the guidelines was in effect at the
time of sentencing and all citations in this opinion are to
that edition of the guidelines unless otherwise specified.

 -6-

and supplies); and the firearm and deaths were found to be

aggravating circumstances in the March 26 operation.

 1. On appeal, Hernandez begins by challenging the

departure. Most of the discussion under this head is

effectively an attack on the district court's findings and

characterizations. The trial judge's findings on sentencing

may be set aside only if clearly erroneous. See United
 

States v. Pineda, 981 F.2d 569, 572 (1st Cir. 1992).
 
Nevertheless, given the magnitude of the departure, the

specific criticisms made by counsel deserve careful

attention.

 First, at sentencing, the district judge orally

described Hernandez' conduct in the March 26 operation as

reckless and criminal behavior resulting in the deaths of two

persons. In the same description, the judge used the word

"murder" in referring to the incident. In a formal

sentencing memorandum, issued a week or so after the

sentencing, the court elaborated on the dangerous conditions

in which Hernandez had transported the aliens and then

referred, "in addition," to Hernandez' "reckless and criminal

behavior, which resulted in the death-murder of two human

beings." United States v. Hernandez-Coplin, 802 F. Supp.
 

657, 661 (D.P.R. 1992). 

 Hernandez now points out that the probation officer,

after interviewing the defendant, concluded that it was

"highly probable" that Hernandez did not anticipate the death

 -7-

of any of his passengers. But there is no inconsistency

between the probation officer's statement and the district

court's summing up of the matter, even assuming that an

inconsistency mattered. Indeed, while the probation officer

did not use the word "murder," he did say that forcing the

passengers out of the yawl into heavy tides reflected a

reckless disregard for human life and the danger posed to the

passengers was reasonably foreseeable.
 We think that the trial judge, like the probation

officer, was describing Hernandez' conduct as criminally

reckless and that the word "murder" was used colloquially to

stress the outrageousness of the conduct and to underscore

the evident danger of death that the conduct posed. So read,

the word "murder" is the kind of moral flourish that is

routine at sentencing and wholly within the trial judge's

discretion. As it happens, Hernandez' conduct might well

constitute the offense of murder in some jurisdictions, under

the felony murder doctrine or merely because the conduct

created a sufficiently direct and foreseeable risk of death. 

 Second, a further challenge to the departure,

defendant's brief in this court takes issue with the district

court's finding that Hernandez did threaten the passengers

with a gun. The brief points out that he consistently denied

doing so, that no gun was found, and that the passenger-

witness spoke of the defendant as having "like" a gun in his

 -8-

hand. The first two points are rather easily explained--the

defendant had a motive to lie and was not captured on the

March 26 trip--and the third is based on an incomplete

version of the testimony: after the passenger witness'

ambiguous reference to "like," the trial judge (as already

noted) specifically asked the witness whether he saw a gun

and received an affirmative reply.

 In all events, the trial judge heard both the passenger
witness and Hernandez testify and specifically resolved the

credibility issue against the latter. Reyes, the co-

defendant, also agreed that the gun had been used, before he

refused to testify--quite possibly out of fear. The

probation officer's report spoke of the use of a handgun by

the defendant being "substantiated by more than one of the

alien witnesses" interviewed by INS. No reviewing court

could possibly find that the district court's own finding

that a gun was used lacked evidentiary support or was clearly

erroneous.

 Third, Hernandez argues that the magnitude of the

departure in this case is "inordinately unreasonable,"

arguing that it amounted to an increase of almost 700 percent

over the guideline ranges otherwise applicable. Mathematics

aside, the departure was certainly substantial, the sentence

for the March 26 operation being the statutory maximum of

five years and the four-year sentence for the April 16

operation being several times the guideline maximum. 

 -9-

 There is no doubt that the district court was entitled

to depart from the guideline range in both cases, based

solely upon the dangerous conditions created by an

inadequately equipped vessel. This is a ground for a

departure, as the guidelines and case law make clear,

U.S.S.G. 2L1.1, application note 8; United States v. Reyes,
 

927 F.2d 48, 52 (1st Cir. 1991), and the undisputed evidence

supports such a finding. It was also clearly permissible
under this rubric to treat as a further aggravating factor

the fact, as found by the district court, that Hernandez had

forced passengers into the water resulting in two deaths.

U.S.S.G. 5K2.1.

 As to the magnitude of the departure, the test is

whether the departure is "reasonable" and under the case law

the standard of review is quite deferential to the district

judge. Reyes, 927 F.2d at 52-53. The "multiple" represented
 

by the departure may be unusual in this case, but the number

of voyagers endangered on the second trip and the fact of two

deaths on the first trip also distinguish this case. The

sentencing memorandum sets forth in detail the basis for

finding that the passengers on both trips were recklessly

endangered. 802 F. Supp. at 658-61. We do not think that

the district judge's choice exceeded permissible bounds.

 2. In his second argument, Hernandez attacks the

district court's failure to allow a two point reduction for

acceptance of responsibility in relation to the March 26

 -10-

operation. Although the district judge did allow such a

reduction for the April 16 operation, based primarily upon

the guilty plea, he denied that reduction for the March 26

operation because Hernandez refused to admit that he had used

a gun and had forced passengers from the boat. This denial,

says Hernandez, is improper because he did admit to the March

26 smuggling operation and is not required to accept

responsibility for other acts not charged in the indictment.
 This seemingly straightforward issue has engaged courts,

and the Sentencing Commission, in a remarkable amount of

controversy. Construing the pertinent guideline as it read

prior to November 1, 1992,3 this court held that as a matter

of construction the guideline did not call upon the defendant

(as a condition of obtaining the reduction) to admit to

conduct charged in other, related counts that had been

dismissed. United States v. Perez-Franco, 873 F.2d 455 (1st
 

Cir. 1989). Indeed, two of the three panel members opined

that any such condition could violate the Fifth Amendment's

privilege against self-incrimination. Id. at 461-64. 
 

 Thereafter, the Sentencing Commission altered the

guideline's application note, effective November 1, 1992, to

 

 3At that time, the guideline provided--in the 1991
version which applies to this case--that in determining
whether the defendant accepted responsibility for "his
criminal conduct," U.S.S.G. 3E1.1(a), the court could
consider whether the defendant had admitted to involvement in
"the offense [of conviction] and related conduct." Id.,
 
application note 1(c). 

 -11-

make clear that acceptance of responsibility required the

court to consider the defendant's action in

 truthfully admitting the conduct comprising the
 offense(s) of conviction, and truthfully admitting
 or not falsely denying any additional relevant
 conduct for which the defendant is accountable
 under 1B1.3 (Relevant Conduct). 

U.S.S.G. 3E1.1, application note 1(a) (1992). Thus, under

the revised guideline the defendant must admit to the conduct

comprising the offense and either admit or remain silent as

to other relevant conduct. Relevant conduct includes "all

actions and omissions committed . . . by the defendant . . .

that occurred during the commission of the offense of

conviction . . . ." U.S.S.G. 1B1.3(a)(1). 

 Under this version of the guidelines, Hernandez would

receive no reduction for acceptance of responsibility as to

the March 26 offense. Forcing passengers into the water with

a gun is clearly relevant conduct; and Hernandez did not

accept responsibility for it or remain silent but, as

supportably found by the district judge, lied by

affirmatively denying that conduct. Whatever the Fifth

Amendment implications of requiring the defendant to admit to
 

another crime, it is clear that the defendant has no license

to lie about the other crime and can be penalized under the

guidelines for doing so. See United States v. Dunnigan, 113
 

S. Ct. 1111 (1993).

 -12-

 Hernandez, however, was not directly subject to this

version of the guidelines which became effective after he was

sentenced. The version of section 3E1.1 in effect at

sentencing, as construed by this court in Perez-Franco,
 

arguably did not require Hernandez to accept responsibility

for anything other than smuggling, see 873 F.2d at 459, and
 

it is debatable whether the pertinent changes in the current

version should be viewed as a clarification or, instead, as a

substantive change that could not be applied retroactively

under the ex post facto clause. See Ebbole v. United States,
 

8 F.3d 530 (7th Cir. 1993) (holding the amendment to be

substantive), cert. denied, 62 U.S.L.W. 3589 (U.S. Mar. 7,
 

1994). 

 We have concluded that these problems need not be

resolved in this case. Assuming that Hernandez was entitled

to the two- point reduction for acceptance of responsibility,

his false denial--we must regard it as such given the trial

court's findings--also required a two-point increase for
 

obstruction of justice under U.S.S.G. 3C1.1. This long-

standing provision, which presents no ex post facto problem
 

in this case, requires a two-level increase for willful

attempts to obstruct justice, at sentencing or otherwise, and

it includes "providing materially false information to a

judge or magistrate." Id., application note 3(f). The
 

 -13-

enhancement is mandatory. United States v. Austin, 948 F.2d
 

783, 789 (1st Cir. 1991).

 This language fully captures Hernandez' action in

denying to the judge that he had used a gun and forced

passengers off his boat into the water. His denials are of

record; the court found them to be lies; and Hernandez knew

what had occurred on the boat and cannot have been innocently

inaccurate. The materiality requirement is satisfied, for a

judge might well take account of the gun episode in

sentencing the defendant for smuggling; indeed, the judge in

this case warned of this possibility at the guilty plea

hearing. Even if the most demanding test of willfulness were

employed, we think that Hernandez had to have made his

statements with knowledge that they might affect his

sentence.4

 Thus even if we assume that a two-point reduction should

have been accorded, it is offset by a two-point increase that

should have been imposed. The fact that the government did

not seek this enhancement certainly does not prevent us from

taking note of it in the present context: at worst, the

district court gave the wrong reason for reaching the right

 

 4The Supreme Court's decision in United States v.
 
Dunnigan, 113 S. Ct. 1111 (1993), suggests that the
 
willfulness requirement is actually less demanding, and may
be satisfied by showing that the defendant lied under oath
and that the matter lied about is material--regardless of
whether the defendant knew that the lie might affect the
outcome. 113 S. Ct. at 1116.

 -14-

result in its calculation. Accordingly, the supposed error

if it occurred was harmless to the defendant.

 3. In his final attack, Hernandez' brief poses the

question whether the district court erred in refusing to

group together the counts in the two separate indictments.

The gist of the argument is that, according to Hernandez, the

district court was required by U.S.S.G. 5G1.3 to treat all

of the counts of the two indictments together and to apply to

them the grouping rules contained in U.S.S.G. 3D1.1 et seq.
 

Hernandez' brief claims that these computations would produce

a total offense level of 11, and a maximum guideline range of

8 to 14 months. In this case, we think there is a problem

with the computation of two separate guideline ranges,

although our reasoning and result differ from the position

urged by Hernandez. 

 Despite Hernandez' reliance on U.S.S.G. 5G1.3(b), that

section almost certainly has nothing to do with this case.

The portion of that section invoked by Hernandez concerned a

defendant who was sentenced under the guidelines while still

subject to an unexpired guidelines sentence previously

imposed. With certain exceptions, 5G1.3(b) provided that

in such a case the new sentence should be computed so that

the old and new sentences together would "equal the total

punishment that would have been imposed under 5G1.2 . . .

 -15-

had all the sentences been imposed at the same time."5 In

our view U.S.S.G. 5G1.3(b) refers to cases in which two

sentences are imposed on different occasions.
 

 Admittedly, this is not crystal clear from the language

of the provision itself; one might argue from the words alone

that the provision also embraces a case where two sentences

are imposed sequentially by the same judge on the same day.

But this reading is implicitly refuted by the commentary to

U.S.S.G. 5G1.2 which already provides that the multiple
 

count provisions apply not only to multiple counts in the

same indictment but also to multiple counts "contained in

different indictments or information for which sentences are

to be imposed at the same time or in a consolidated

proceeding." In other words, the government is right in

arguing that U.S.S.G. 5G1.3 did not apply, but Hernandez is

correct in thinking that the concept embodied in U.S.S.G. 

5G1.2 applies anyway.6

 

 5The language that arguably made U.S.S.G. 5G1.3(b)
applicable to this case was subsequently deleted from the
guidelines, see U.S.S.G., App. C, amendment no. 465, at 290
 
(1992), but we consider the guideline language as it stood in
1991.

 6We say "the concept" because formally part 5G,
containing 5G1.2, does not itself come into play until the
court has determined a guideline range, and then chosen a
specific sentence within or (where a departure occurs)
outside the range. Still, 5G1.2 would not make much sense
unless we also assumed that the grouping rules under chapter
3, part D had previously been applied to counts "contained in
different indictments . . . for which sentences are to be
imposed at the same time." Accordingly, we read this concept

 -16-

 This, however, is only the first step in the sequence.

Even if one treats the use of two indictments rather than one

as irrelevant to sentencing, the question remains how to

apply the guidelines to the multiple counts in this case.

The grouping rules answer this question by first directing

that the district court group together into a single group

each set of "closely related counts." U.S.S.G. 3D1.1(a).

Hernandez argued at length to the district court, and appears

to assume in this court, that all ten counts to which

Hernandez pled guilty comprised one group of closely-related

counts. If this were so, the total offense level for the

entire group would be the offense level for the single most

serious count. U.S.S.G. 3D1.3.

 But it is not so because under the guideline definition

of closely related counts, the counts relating to the March

26 smuggling operation constitute one group of closely

related counts and the counts relating to the April 16

operation constitute a separate group of closely related
 

counts. The grouping rules expressly say that counts are not

to be grouped together where the "[t]he defendant is

convicted of two counts, each for unlawfully bringing one

alien into the United States, but on different occasions."

U.S.S.G. 3D1.2(b), application note 3, example 7. Thus the

district court was quite correct in rejecting Hernandez'

 

into chapter 3, part D.

 -17-

request to treat all of the counts in both indictments as a

single group of closely related counts.

 It does not follow, however, that separate guideline

ranges are to be used for the two indictments. Rather, where

the multiple count grouping rules apply but there is more

than one group of closely related counts, the groups must be

combined according to a formula specified in U.S.S.G. 

3D1.4. It is not entirely surprising that the district judge

overlooked the final step: neither the prosecutor nor

defense counsel argued for this outcome; the probation

officer apparently overlooked the point; and it is hardly

intuitive that a defendant should receive a volume discount

in sentencing for arguably unrelated offenses.

 Why this discount is made available by U.S.S.G. 3D1.4

is nowhere explained in the guidelines. It appears, however,

that the guideline drafters were trying to assure some

discount for crimes that did not happen to fall within the

closely related count definitions but were still sufficiently

related so that merely to compute individual sentences and

add them together would overstate the seriousness of the

offenses.7 However, the guidelines as drafted operate
 

 

 7For example, a defendant who in a single criminal
episode (say, a bank robbery) injured two persons would not
normally have the separate counts for the two injuries
grouped as "closely related," because two separate victims
are involved. U.S.S.G. 3D1.2. But it might be thought by
some, including the guideline drafters, that such conduct is
more culpable than injuring a single victim but less culpable

 -18-

generally, perhaps crudely, by offering the discount wherever

the multiple counts happen to be charged in the same

indictment (or, as we read the guidelines, wherever the

defendant is sentenced at the same time under multiple

indictments).

 Because it turns on mechanical choices (namely, the

choice to use a single indictment or treat multiple

indictments together), the volume discount for counts that

are not closely related may sometimes turn out to be

available where its apparent rationale does not apply.

Pertinently, a discount might be warranted where two aliens

are smuggled on a single trip (indeed, the guidelines treat

the counts as closely related); but it may be harder to see

why a discount should be applied for two separate smuggling

ventures at separate times, even though they may be the

subject of a single indictment or two indictments handled

together. Any such anomaly, however, can be handled by

sentencing at the high point of the range or by a departure.

 In all events, the discount is explicit: a "combined

offense level is determined by taking the offense level

applicable to the Group with the highest offense level and

increasing that offense level by the amount indicated in the

. . . [specified] table." U.S.S.G. 3D1.4. We have already

 

than injuring two victims in two entirely different episodes.

 -19-

explained why we agree that the district court reached the

right result (or at least one as favorable as the defendant

deserved) in computing an offense level of 11 for the March

26 operation. At this point, U.S.S.G. 3D1.4 called upon

the district judge to increase this figure by 2 levels to

create a combined offense level of 13.8 Instead, the

district court treated the two indictments as giving rise to

separate offense levels and to separate guideline sentencing

ranges.

 The question remains whether the omission of the final

refinement had any bearing on the total sentence imposed by

the district court. If the district court had sentenced

within the guideline range, the proper offense level of 13
 

would have dictated a sentence of imprisonment of 12 to 18

months. The judge chose instead to depart very

substantially, imposing a total term of imprisonment of nine

years. Looking to the factors that apparently underlay the

judge's departure, one may doubt whether the failure to

combine the two offense levels made any difference in the

ultimate sentence of nine years.

 Nevertheless, we have chosen to vacate the sentences and

remand for resentencing because we cannot be confident that

 

 8The formula in U.S.S.G. 3D1.4(a) calls for a two-
level increase where (as here) there is a second group of
closely-related counts whose offense level is as serious as
or within 1 to 4 levels less serious than the most serious
group. 

 -20-

the mistake was harmless. See Williams v. United States, 112
 

S. Ct. 1112, 1121 (1992). Resentencing in this instance

requires no additional evidence and is only a small

administrative burden. Even small adjustments could make a

lot of difference to the defendant. Above all, the great

latitude possessed by the district court in deciding how far

to depart makes it all the more important that the district

judge exercise a fully informed discretion. At least in this

case, we think this information should include the correct

computation of the point of departure.

 The use of a single combined offense level in no way

prevents the district judge from imposing a sentence of nine

years on remand. The various grouping rules are used in

determining the guideline sentence range; once the judge
 

determines to depart from that range, the statutory maximum

is derived by adding up the maximums for each of the counts

on which the defendant was convicted, here five years for

each of ten counts. Cf. U.S.S.G. 5G1.2(d).9 Of course,
 

no one suggests that a sentence of fifty years would be a

 

 9 "[T]he total punishment" under U.S.S.G. 561.2 is
normally determined by the guideline range, see id.,
 
subsection (b), but where the sentencing court lawfully
departs from the guideline range, "the total punishment" is
the punishment specified as a result of that departure; and
sentences then run consecutively "to the extent necessary to
provide a combined sentence equal to the total punishment."
See id. subsection (d).
 

 -21-

proper departure, but that is because of the reasonableness

requirement and not on account of the grouping rules.

 The grouping rules are one of those chapters in the

Sentencing Guidelines where practical judgments, unexplained

policy choices, and extreme complexity are so fused that even

the most expert of lawyers and judges can be led astray. The

glitches that occurred here cast no reflection on the very

able district judge. Whatever one's conception of the right

sentence in this tragic case, the district court approached

the matter with the care, concern and seriousness that

sentencing issues always deserve.

 The sentences are vacated and the case is remanded for
 

resentencing on the premise that the point of departure is a

combined offense level of 13. 

 It is so ordered.
 

 -22-